# Young & Son *v.* Lehman, Durr & Co.*

### *Action for Money Paid, Money Had and Received, &c.*

1. *When action lies for money paid by mistake.*—Money paid under a mistake of a material fact may be recovered in an action on the common counts in assumpsit, although the person making the payment had in his power the means of ascertaining the facts, and was guilty of negligence in not ascertaining them; but such negligence on his part is a fact for the consideration of the jury, in determining whether his alleged ignorance was real or feigned.

2. *Same, for money paid under forged instrument.*—A person who discounts a negotiable instrument which is forged, and to which he is not a party, may recover back the money so paid; but, when he is a party to the instrument, and stands in such a relation to the other parties that he ought to know whether it is genuine or not, he can not recover money paid on it.

3. *Same.*—The acceptor of a bill of exchange is chargeable with a knowledge of the drawer's signature, and can not recover money paid on a forged signature; but, if a material alteration is made in the draft, after it has been signed by the drawer, and the drawee is not guilty of any negligence in the matter, he may recover money paid on it in ignorance of the alteration; yet not against the drawer, unless negligence can be attributed to the latter.

4. *Action between innocent sufferers by wrongful act of third person.*—As between persons equally innocent, one of whom is bound to know and act upon his knowledge, while the other has no means of knowledge, the latter will not be burdened with a loss, in exoneration of the former; and when one of two innocent persons must suffer by the tortious act of a third, he must bear the consequences who gave the wrongdoer the means of doing the wrongful act.

5. *Same; letter of credit; money paid on forged bill of lading.*—A letter authorizing the person to whom it is addressed to draw on the writers for any cotton he may buy in a named city, provided the draft is accompanied by a bill of lading of the cotton, and does not in amount exceed three-fourths of the market price of the cotton, binds the writers, as in favor of any person who, on the faith of the letter, advances the money to buy the cotton, for a draft which conforms to the prescribed conditions, although the accompanying bill of lading is not genuine; and having paid the draft, they can not recover back the money, on discovering the fraud in the bill of lading.

APPEAL from the Circuit Court of Barbour.

Tried before the Hon. H. D. CLAYTON.

This action was brought by Lehman, Durr & Co., of Montgomery, against E. B. Young & Son, of Eufaula, to recover the sum of $2,409.60, for money paid by plaintiffs, on the 1st December, 1875, under the following circumstances: The plaintiffs were and are cotton factors and general commission-merchants, doing business in the city of Montgomery; and the defendants were and are brokers, doing business in Eufaula. Some time in November, 1875, a stranger came

---

*This case was decided at the December term, 1878.—REP.

to Montgomery, giving his name as Albert Johnston, and representing himself as a man of considerable means, who desired to invest his money in lands in the vicinity of Montgomery. He was introduced to Lehman, Durr & Co., and deposited $2,000 with them; saying that he intended to visit Eufaula before purchasing any lands, and that he might "buy some cotton on his travels in order to pay his travelling expenses." On the 23d November, 1875, plaintiffs paid him $1,000, on his checque, for that amount; and on the 25th he drew another checque on them for $1,000, from Eufaula, which was presented to them the next day and paid, they being advised by letter from him that he had drawn on them for the amount. On the 24th November, Johnston wrote to plaintiffs, from Morris, Georgia, as follows: "The prospect is, that I shall pick up some cotton. Will you send me a letter, so that I can go either to Eufaula' or Cuthbert, to draw money? I have gotten in with a merchant here. Please allow me to draw as much as possible, as my means *is* small until I can get on more money. I have to-day bought nine bales here." In reply to this letter, plaintiffs wrote to said Johnston, under date "Montgomery, Nov. 25th, 1875," as follows:

"*Albert Johnston*, Morris, Ga. Dear Sir: Your favor of the 24th inst. just received, and note contents. For any shipments of cotton you may make to us, we will allow you to draw for three-fourths ($\frac{3}{4}$) value of shipment, with bill of lading attached to draft; and your drafts to this extent will be honored on presentation. By showing this to any banker in Eufaula or Cuthbert, they will cash your drafts on us, with B. L. attached. We would advise you to be very careful in making purchases. See that cotton is properly weighed; that it is dry, not mixed, sandy, or seedy, as these defects would cause cotton to be rejected, and might cause you some loss. Our market is quiet. Low Middlings, 12."

Signed, "LEHMAN, DURR & Co."

On the 27th November, Johnston shipped to plaintiffs, from Midway, Alabama, five bales of cotton; advising them of the shipment by letter, and asking them to remit the proceeds of sale to him at Eufaula. In reply, on the 30th November, they acknowledged the receipt of his letter, "with R. R. receipt 5 B. C.," and remitted to him $225, as an advance on the five bales; but Johnston failed to get the money from the Express office, and it was sent back to plaintiffs. On the 30th November, Johnson drew his checque for $2,409.60, payable on demand, to the order of E. B. Young & Son, on said Lehman, Durr, & Co., at Montgomery; and at-

tached to said draft were two bills of lading, signed by the Central Railroad and Banking Company, one being for thirty-four bales of cotton, and the other for twenty-one; and said E. B. Young & Son advanced to him the amount of the draft, less one half of one per cent. "The said bills of lading were forgeries, in this: one of them was issued originally for one bale, and fraudulently raised to twenty-one; and the other was originally issued for four bales, and fraudulently raised to thirty-four bales. All this was done by said Johnston, before said bills of lading, attached to said draft, were presented to said defendants. The body of said bills, where written, had been originally filled up by Johnston, by consent of the railroad agent at Morris, Georgia; the agent signed them so filled up, and Johnston afterwards fraudulently raised them, as before stated. When said Johnston presented said draft, with said bills of lading attached, to defendants, he at the same time exhibited to them the said letter from plaintiffs, above set out, dated the 25th November, as his authority for drawing on plaintiffs; and defendants thereupon cashed said draft, paying for it its face value less one-half of one per cent. Johnston was a stranger to said defendants, and they had never had any other transaction with him; and they cashed said draft solely on account of said letter of credit from plaintiffs, which he then and there exhibited to them, knowing plaintiffs, but knowing nothing of said Johnston. Defendants immediately forwarded said draft, with their indorsement thereon, and with said bills of lading attached, to the cashier of the First National Bank of Montgomery, their correspondent, for collection; and said draft, with said bills of lading attached, were presented by said cashier to plaintiffs, on the 1st December, 1875; and plaintiffs immediately paid the same, and the money was at once remitted by said cashier to defendants as directed."

On the 30th November, the same day on which Johnston drew his said draft on plaintiffs, he wrote to them, as follows: "I did not get any money by express this morning. Please send the money you may have, by express, to this firm" [defendants'], "and oblige. I drew on you this day for sixty bales of cotton. I only drew eight (8) cents on a pound. Hoping all this is satisfactory," &c. "This letter was received by plaintiffs, before they paid the draft therein mentioned, and before the same was presented for payment. When they paid said draft, and received the same with bills of lading attached, plaintiffs had not received any of the cotton mentioned in said bills of lading, nor had they or their agents seen any part of said cotton. They made that payment under the honest belief that said bills of lading and

draft were genuine and honest in every respect, and that there was no forgery or wrong about them; and when defendants cashed said draft, they likewise had no notice, knowledge, or information that there was anything wrong about said bills of lading, and acted in good faith in cashing said draft, upon the letter shown to them by Johnston." The five bales of cotton shipped from Morris, Georgia, for which the bills of lading were in fact given, were received by plaintiffs, and sold by them; but the fraud in the bills of lading being discovered in three or four days, they bought these bales back again, and tendered them to the defendants, with the draft and the forged bills of lading, and demanded the repayment of the money; which demand being refused, they brought this action to recover it.

On these facts, the court charged the jury, that, if they believed the evidence, they must find for the plaintiffs, for the amount paid by them on the draft, less the proceeds of sale of the five bales of cotton; and refused to charge, as requested by the defendants, that they should find for the defendants if they believed the evidence. The charge given, and the refusal of the charge asked, are now assigned as error.

S. H. DENT, for the appellants.

RICE, JONES & WILEY, contra. ˙ (No briefs on file.).

BRICKELL, C. J.—The general rule of law is clear and undisputed, that money paid under a mistake, on the part of the payor, of *a material fact*, may be recovered of the person receiving it, in an action of assumpsit, on either of the common counts, *for money had and received, or for money lent, or for money paid.* The authorities in this court do not excuse the person receiving from liability, because the payor, before making payment, had in his power the means of ascertaining the facts, and was not diligent in the employment of such means. That he had the means of informing himself, and imputes to himself negligence in not employing them, are circumstances for the consideration of the jury, in determining whether the professed ignorance is real or feigned. But, borrowing the language of Chitty on Contracts, "there is no conclusive rule of law, that because a party has the means of knowledge, he has the knowledge itself."—2 Chitty on Contracts, 930; *Wilson v. Sergeant,* 12 Ala. 778; *Rutherford v. McIver,* 21 Ala. 750.

An instance of the application of this general principle is, that if one who is not a party to a negotiable instrument

discounts it, and the instrument is forged, he has parted with his money by mistake, and may recover it back from the recipient of it; "for, in such case, there is a failure of the consideration."—2 Chitty on Contracts, 931; 2 Dan. Neg. Ins. §§ 1369–70. Another instance, in which an action for money had and received may be supported, is when a note or bill is paid by one innocent, to a holder equally innocent, in spurious or counterfeit bank-bills.—*U. S. Bank v. Bank of Georgia*, 10 Wheat. 333. But an acceptor of a bill, to which the signature of the drawer is *forged*, is bound nevertheless to pay it to an innocent holder; for the presumption is, that he knows the handwriting of his customer, and the acceptance giving authority and currency to the bill, he can not subsequently dispute the signature.—2 Pars. Notes & Bills, 590. Having paid the draft or bill, though under an innocent mistake as to the genuineness of the signature of the drawer, he can not recall the payment, and recover the money from the *bona fide* holder to whom the payment was made.— *Price v. Neal,* 3 Burr. 1355; *National Park Bank v. Ninth National Bank*, 46 N. Y. 77. So, a bank, receiving from a *bona fide* holder its own notes as cash, though they may prove to be spurious, has no recourse against the holder from whom they are received. The receipt of the notes is *deemed an adoption of them. It has the means of knowing if they are genuine; and if these means are not employed, it is certainly evidence of a neglect of that duty, which the public have a right to require. And in respect to persons equally innocent, where one is bound to know, and act upon his knowledge, and the other has no means of knowledge, there seems to be no reason for burdening the latter with any loss in exoneration of the former.—* *U. S. Bank v. Bank of Georgia, supra.*

These general principles the appellees do not controvert; but it is insisted, they are not of application to the facts of the present case, which involve no dispute of the signature of Johnston, the drawer of the draft, but of the genuineness of the bills of lading attached to the draft; and, therefore, the case falls within the principle which prevails when there is an alteration of the body of a bill or draft the drawee ignorantly pays. Knowledge of the writing composing the body, or a part of it, of a bill or draft, is not imputed to the drawee. It is not necessarily, and often is not, the writing of the drawer; and it is not presumable the drawee is more capable than the holder, of detecting any alteration which may be made in it. Hence, if the drawee is not guilty of negligence, he can recover money he may pay on a bill or draft altered in the body after signature by the drawer.—Morse on Banks, 300–1, and authorities cited in notes; *Bank of Commerce v.*

*Union Bank*, 3 Coms. 230. There is a manifest difference, however, between such a case and the present. The drawer could not be made liable to the drawee, on the altered draft or bill, unless his own negligence contributed to mislead the drawee; as in the case of *Young v. Grote*, 4 Bing. 253, where the drawer left blank checks, signed by himself, in the hands of his wife, to be used during his absence, as the exigency of his business required; she carelessly filled up one, so that it was easily altered for a much larger sum than she inserted, and the alteration was not discoverable by the use of ordinary diligence; in its altered state, it was paid by the drawee innocently, and it was held the drawer must bear the loss. It is, in the present case, the fraud of the drawer, which must involve one of the parties in loss, and of his liability to the appellees there can be no doubt.

The fact is patent, that the letter of credit, given to Johnston by the appellees, was an invitation to the appellants, or to any bank or banker in Cuthbert, Georgia, or in Eufaula, to discount his drafts drawn on the appellees, if bills of lading of cotton consigned to them were attached, and the amount of the drafts did not exceed three-fourths the market price of the cotton. It would be so read and construed in the commercial world, and it was doubtless so intended by the appellees when it was written. The letter induced the appellants into the discount of the draft. The law simply utters the suggestion of common justice, and common sense, in declaring "that when one of two innocent persons must suffer from the tortious act of a third, he who gave the aggressor the means of doing the wrong must bear the consequences of the act."—*Bank of Kentucky v. Schuylkill Bank*, Pars. Select Eq. Cases, 248.

The argument for the appellees is, however, that the parties are not equally innocent—that the letter of credit cast on the appellants the duty of ascertaining, before discounting the draft, and presenting it for payment, whether the bills of lading were genuine; and not having observed this duty, the loss is a consequence of their negligence, and they must bear it. The argument is not supported by authority, nor is there any sound reason, or principle, on which it can rest. The authority of Johnston to draw on the appellees was not general and unlimited. The limitation was, that the draft should be accompanied by bills of lading of cotton consigned to the appellees, and should not in amount exceed three-fourths the market price of the cotton. If he had drawn a draft, not accompanied by a bill of lading, or for an amount so much in excess of three-fourths of the value of the cotton shipped that the violation of the terms of the letter

would have been apparent if ordinary prudence was exercised, the appellees could not have been made liable. The authority conferred by them would not have been exercised, and no party could have taken the bill in reliance upon it. But, when bills of lading are attached to the bill, and it does not in amount exceed three-fourths the market price of the cotton these bills purport to represent, it would embarrass the transaction of business, if the banker requested to discount the bill was bound to inquire whether the bills of lading were genuine. If the duty is imposed on the banker first discounting, it would rest equally on each subsequent holder, who sought to charge the appellees. Thereby, the negotiability of the bill would be seriously impaired, if not destroyed. The bill of lading is the security the appellees required Johnston to furnish them, for their protection against loss from their payment of his drafts. If it is not genuine, all that can be said is, there is a failure of the security for which they stipulated with him. The bank or banker, discounting the draft, was bound only to see that there was a bill of lading, importing a consignment of cotton to the appellees by Johnston, accompanying the draft, and that in amount the draft did not exceed the specified proportion of the value of the cotton. It was not the intention of the appellees, so far as their intention can be collected from the letter, that the bank or banker discounting on its faith the draft of Johnston, should inquire whether Johnston, was dealing fairly with them—furnishing them adequate security for their acceptance or payment of the draft. Devolving such a duty on the bank or banker, by the embarrassments which would necessarily follow, would so seriously impair the negotiability of the draft, that the very purposes of the letter of credit would be defeated All the bank or banker was bound to do, was to see that bills of lading, professing on their face, in the ordinary form, to represent a consignment of cotton to the appellees, accompanied the draft, and that the draft was not in excess of the proper amount. The assurance of the letter of credit was, that such a draft would be paid by the appellees on presentment.

In *Woods v. Thiedeman*, 1 Hurl. & Colt. 478, involving this question, it was said by POLLOCK, C. B. : " The only argument for the defendant is, that the words ' bill of lading,' import a genuine bill. I am of opinion, they mean such a document as Horneyer " (the drawer of the bills) " might send, or which was in the course of coming, professing to represent a cargo of wheat ;" and such, he said, "is the meaning of the contract—not that the plaintiffs were to take upon themselves the risk of the bill of lading being a genuine instrument."

In *Ulster Bank v. Synott*, 5 Irish Eq. 595, the question was very fully discussed, and thoroughly considered by the vice-chancellor, under a state of facts closely resembling that found in this record.   The same conclusion was reached, as in *Woods v. Thiedeman*, that it was not the duty of the party discounting the bill to inquire into the genuineness of the bill of lading.   It was the appellees, who had entered into business relations and dealings with Johnston, conferring upon him authority to draw on them, and assuring banks or bankers, at two named places, where he represented that he expected to buy cotton, that if bills of lading were attached to, or accompanied his drafts, they would be paid on presentation.   They, and not the banks or bankers who acted on the letter of credit, are the sponsors of Johnston's honesty. Whatever of ability he had to injure others, proceeded from the letter of credit; and if their confidence has been abused, they furnished the means of the wrong, and must bear its consequences.

The drawee of a bill of exchange, who accepts it, can not resist its payment, as against a *bona fide* holder, because the acceptance is without consideration, or the consideration has failed:—1 Pars. Notes & Bills, 179.   Nor, having paid it, though in ignorance of the want or failure of consideration, can he reclaim the money.—*Robinson v. Reynolds*, 2 Adol. & El., N. S. 196 (42 Eng. C. L. 638–641); *First National Bank v. Burkham*, 32 Mich. 328.   In the latter case, the mistake of the drawees when they paid the bill, as in this case, was as to the genuineness of a security accompanying the bill; it was fictitious, when they supposed it to be genuine and reliable.   Cooley, J. said: "Admitting this to be so, how does the fact concern the payees?   Do they assume to guarantee the fairness of the dealings of the drawers with the drawees, or the adequacy of any securities upon which the dealings are based?   Not, certainly, in ordinary cases.   The law merchant gives the payees the right to assume that any draft they receive and forward, if it is accepted and paid, is a draft which, from the state of the dealings between drawers and drawees, it is right and proper that the latter should pay as the principal party; and the presumption of law, that such is the case, is their complete protection, if they received the bill in the ordinary course of business, and for value.

It is doubtless true, the appellees relied on the bills of lading, as a security protecting them in the payment of the draft.   There was no representation or warranty of their genuineness by the appellants.   The only representation which can be attributed to them is, that the bills were received from Johnston, in the condition in which they accompanied the

[Henry & Co. v. Northern Bank of Alabama.]

draft. There was no other representation, as there was none of Johnston's integrity or solvency. A mistake of either by the appellees, when they paid the draft, would be a mistake of fact, as well as their mistake of the genuineness of the bills of lading. To transfer responsibility for either mistake, from the appellees, to the appellant, is to reverse the rules of the commercial law, and to exonerate from liability the party enabling a stranger to commit a wrong, casting it on him who innocently trusted, where such party invited trust and confidence.

The Circuit Court erred in the charge given, and the refusal to charge as requested.

Reversed and remanded.