**MOORE et al. v. FIRST NAT. BANK OF BIRMINGHAM. (6 Div. 103.)**

(Supreme Court of Alabama. April 24, 1924. Rehearing Denied May 29, 1924.)

**1. Bills and notes ☞537(1)—Manner of perpetration of fraud on indorsers of draft held for jury.**

In action against bank for amount charged to plaintiff's account because of draft indorsed by plaintiffs, who claimed to have indorsed draft for much smaller amount, manner in which fraud was perpetrated *held* for jury.

**2. Alteration of instruments ☞9 — Detachment of draft pasted to draft for larger amount held not material "alteration."**

Detachment of $15 draft, pasted at corners to $480 draft, *held* not such material alteration within Negotiable Instrument Law, § 125, as to relieve indorsers of liability under section 124; "alteration" signifying material change in contract by party thereto.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Alter—Alteration.]

**3. Estoppel ☞72—When one of two innocent persons must suffer, one giving means of doing wrong must bear consequences.**

When one of two innocent persons must suffer from tortious act of third, he who gives latter means of doing wrong must bear consequences.

**4. Bills and notes ☞537(1)—Negligence of indorsers of draft, to which draft for smaller amount was pasted, held for jury.**

Negligence of persons indorsing draft, to which was pasted, at two corners only, draft for much smaller amount, in reliance on representation of payee, in whom they had implicit confidence, that he had funds in bank on which drawn, *held* for jury.

**5. Appeal and error ☞1078(1)—Assignments not argued in brief nor relied on considered waived.**

Assignments of error, not argued in appellant's brief nor relied on, are considered waived.

Appeal from Circuit Court, Jefferson County; Dan A. Green, Judge.

Action by Bessie Moore, as administratrix of the estate of T. L. Moore, deceased, and another, against the First National Bank of Birmingham. Judgment for defendant, and plaintiffs appeal. Transferred from Court of Appeals under Acts 1911, p. 449, § 6. Affirmed.

Brenton K. Fisk, of Birmingham, for appellants.

The draft, having been materially altered, was avoided as against appellants. Acts 1909, p. 146, § 124; Bothell v. Schweitzer, 84 Neb. 271, 120 N. W. 1129, 22 L. R. A. (N. S.) 263, 133 Am. St. Rep. 623; Stephens v. Davis, 85 Tenn. 271, 2 S. W. 382. The bank paid its

own money to the imposter, and had no right to charge more than $15 to the account of appellants. So. Hdw. Co. v. Lester, 166 Ala. 86, 52 South. 328; Curtis v. Parker & Co., 136 Ala. 217, 33 South. 935; Russell v. Hartselle Bank, 2 Ala. App. 342, 56 South. 868.

Cabaniss, Johnston, Cocke & Cabaniss, of Birmingham, for appellee.

Appellants must suffer the consequences of their own credulity and want of caution. Shirts v. Overjohn, 60 Mo. 305; Frederick v. Clemens, 60 Mo. 313; Cannon v. Moore, 17 Mo. App. 92; Bank v. Lotton, 67 Ind. 256; Voshburg v. Diefendorf, 119 N. Y. 357, 23 N. E. 801, 16 Am. St. Rep. 836; Citizens' Bank v. Smith, 55 N. H. 593; Chapman v. Rose, 56 N. Y. 137, 15 Am. Rep. 401; Ruddell v. Fhalor, 72 Ind. 533, 37 Am. Rep. 177. The burden was on appellants to show freedom from negligence in execution of the paper. Fayette Bank v. Steffs, 54 Iowa, 214, 6 N. W. 267; Ward v. Johnson, 51 Minn. 480, 53 N. W. 766, 38 Am. St. Rep. 515.

GARDNER, J. This suit was originally instituted by T. L. Moore and his wife against the First National Bank, for the recovery of $480 due for money on deposit in said bank to their account. T. L. Moore died before the trial of the cause, and it was revived in the name of Bessie Moore, as administratrix of his estate, and proceeded to judgment with Bessie Moore, as administratrix, and Mrs. T. L. Moore, as parties plaintiff.

The litigation grew out of the indorsement by Mr. and Mrs. T. L. Moore of a certain draft drawn by one Olcott on the First National Bank of Richmond, Va., for the sum of $480. The Moores were depositors of the First National Bank of Birmingham, where Olcott presented the draft with their indorsements thereon, and received the full amount therefor.

The Moores insist there was a fraud practiced upon them by Olcott or a forgery committed in some manner, as they only indorsed the draft or intended to indorse the draft in the amount of $15. The bank insisted there was nothing upon the face of the instrument to arouse suspicion, and, as the signatures of the indorsers were genuine, it acted in good faith, and as a bona fide holder was entitled to protection.

The issues were submitted by the court to the jury for determination, resulting in a verdict in favor of the defendant, from which the plaintiff has prosecuted this appeal.

The salient facts are as follows: The Moores, residing in Birmingham, Ala., were keeping a rooming house, and during the early part of September, 1920, Olcott, a stranger, applied for and obtained room. He remained less than three weeks, stating

to them that he was from New Orleans, and had merely stopped over and was on his way to Columbia, Tenn. Columbia, Tenn., was Mr. Moore's old home, and Olcott appeared to be acquainted with those Mr. Moore knew. Moore was 72 years of age and sick, and Olcott was near the same age. Olcott gained the confidence of the Moores, and some two or three days before the indorsement of the draft here in question he stated to the Moores that he wanted to send $10 through the mail to Richmond, but did not want to place a $10 bill in the letter for fear it might be stolen, and requested the Moores to give him a check for said amount in exchange for the $10; this they did.

Thereafter, on September 18th, Olcott applied to the Moores for the indorsement of the draft in question, stating it was just $15, and that he wished to go home in answer to a telegram. Speaking of this transaction, Mrs. Moore said:

"And Mr. Moore came in and asked me—I was busy, and they came in off the porch—to sign that check [indicating said draft], and I signed the check for $15, and so did Mr. Moore. I am speaking of this draft that I indorsed on the back. * * * I wrote my name on the back of the $15 draft. He brought it in, and he just handed it to us and of course we indorsed it; that is all I know about it."

This witness further stated that she and her husband read the draft, and looking at the indorsements thereon, that they were, in her opinion, their indorsements. On cross-examination, further referring to this same transaction, the witness said:

"When our indorsement was placed on it Mr. Olcott just handed the paper over to us; we all had it in our hands and turned it over and wrote our indorsement on it. * * * I think Mr. Olcott left our home the same day we gave him the draft. * * * This draft we indorsed for the purpose of enabling him to get money to leave town."

The cashier of the bank testified that he handled the transaction resulting in the payment of this draft of $480, that at the time the holder of the draft presented it to the bank to be cashed he also presented the check for $10, bearing the signature of Mr. and Mrs. Moore, and that the Moores carried an account at this bank in the name of Mr. and Mrs. T. L. Moore. This account was offered in evidence to show that the Moores had frequently drawn sums in amounts equally as large and larger than the amount of this draft. The cashier stated he first took steps to ascertain whether the signatures on the back of the draft and on the check were genuine by comparing them with the signature card, and, having satisfied himself that they were genuine, and there were sufficient funds on hand to their account, he paid the draft. The draft

being forwarded to Richmond, was dishonored by the bank at that place and returned to the First National Bank of Birmingham, and the amount thereof charged back to the account of Mr. and Mrs. Moore. The original draft is forwarded to this court for inspection.

It is not contended there is anything in the face of the instrument to arouse the slightest suspicion. Upon the upper left-hand corner a small portion of the paper fiber appears to have been removed, and a still smaller portion from the lower right-hand corner.

[1] It is the theory of counsel for appellant that Olcott perpetrated the fraud upon the Moores by pasting over this draft which may have already been filled out or may at the time have been a blank, another draft for the $15, and thus having the two drafts pasted together obtained the indorsements of the Moores on the back of the draft here in question. This is doubtless a very plausible theory.

It is suggested by counsel for appellee, however, that this draft may have been substituted for the $15 one by clever manipulation, or a blank draft may have been substituted for the $15 draft in like manner. As to how the fraud was perpetrated, however, was for the jury's determination.

We may assume for the purposes of this case that the Moores were deceived as contended by counsel for appellant; that is, this draft was doubtless prepared and the $15 draft pasted over it by a small amount of mucilage at each corner, as above indicated. Accepting appellants' surmise we still think the cause was properly left for the jury's determination.

[2] It is insisted that, if the face of the draft here in question were covered over by the attached $15 draft, and the indorsements upon this particular instrument in this manner secured, when the $15 draft was detached therefrom this was such a material alteration of the instrument here involved as to relieve the indorsers of all liability, citing section 124 of the Negotiable Instrument Law (Gen. Acts 1909, p. 146).

We are not inclined to accept the view that the detachment of the $15 draft fastened to the draft here in question, in the manner heretofore indicated, at the corners thereof, was such a material alteration of the instrument involved in this litigation within the meaning of the Negotiable Instrument Law and the authorities generally. The term "alteration" in this country is understood to signify a material change in the contract by a party thereto. 2 Daniel on Negotiable Instruments, § 1373a, and in section 1375 the author points out in what alterations consists—none of which do we think the case here presented is embraced. In the case cited in the note to Bothell v. Schweitzer, 22 L. R. A. (N. S.) 263, the de-

tached paper formed a material part of the original contract.

Here the $15 draft formed no part of the contract in question; it was merely used as a means of deception and to shield the fraud which was being perpetrated. What constitutes a material alteration is set out in section 125 of the Negotiable Instrument Law in the act above indicated, and clearly discloses that it must be a change in the contract itself. We are of the opinion, however, that, even should it be considered an alteration, still the plaintiff was not entitled to the affirmative charge for reasons to be now stated.

In 2 Daniel on Negotiable Instruments, § 1405, is the following:

"There is a general principle which pervades the universal law merchant respecting alterations (which, when they are material, will, as we have seen, vitiate the bill or note even in the hands of a bona fide holder without notice); a principle necessary to the protection of the innocent and prudent from the negligence and fraud of others. That is, that when the drawer of the bill or the maker of the note has himself, by careless execution of the instrument, left room for any alteration to be made, either by insertion or erasure, without defacing, or exciting the suspicions of a careful man, he will be liable upon it to any bona fide holder without notice when the opportunity which he has afforded has been embraced, and the instrument filled up with a larger amount or different terms than those which it bore at the time he signed it. The true principle applicable to such cases is that the party who puts his paper in circulation invites the public to receive it of any one having it in possession with apparent title, and he is estopped to urge an actual defect in that which, through his act, ostensibly has none."

In Winter-Loeb v. Pool, 104 Ala. 580, 16 South. 543, this court gave application to the foregoing principle, holding the maker of a note liable to a bona fide holder without notice because of his negligence in the careless execution of the instrument, in leaving a blank space following certain printed words, of sufficient length to permit the insertion of a designated place of payment, without having such space marked or otherwise drawn across with a pen.

[3] In Holmes v. Bank of Ft. Gaines, 120 Ala. 493, 24 South. 959, this court cited with approval Winter-Loeb v. Pool, supra, and again applied the principle of negligence recognized in the latter authority. As said in Young & Son v. Lehman-Durr & Co., 63 Ala. 519:

"The law simply utters the suggestion of common justice, and common sense, in declaring 'that when one of two innocent persons must suffer from the tortious act of a third, he who gave the aggressor the means of doing the wrong must bear the consequences of the act.'"

This general principle has become a maxim of law; but, as said by the Michigan Court in Burson v. Huntington, 21 Mich. 415, 4 Am. Rep. 497:

"It will be found that this rule or maxim is mainly confined to cases where the party who is made to suffer the loss has reposed a confidence in the third person whose acts have occasioned the loss, or in some other intermediate person whose acts or negligence have enabled such third person to occasion the loss. * * * When the maker or indorser has himself been deceived by the fraudulent acts or representations of the payee or others, and thereby induced to deliver or part with the note or indorsement, and the same is thus fraudulently obtained from him, he must, doubtless, as between him and an innocent holder for value, bear the consequences of his own credulity and want of caution. He has placed a confidence in another, and by putting the papers into his hands, has enabled him to appear as the owner, and to deceive others."

In other authorities it is said that where a person intends to execute a negotiable note he is bound to know he is furnishing the means whereby a third party may be deceived and innocently led to part with property upon the strength of his signature, in ignorance of the true state of facts. Fayette Co. Bk. v. Steffes, 54 Iowa, 214, 6 N. W. 267.

In Shirts v. Overjohn, 60 Mo. 305, is the following language here pertinent:

"It would be exceedingly difficult to lay down with accuracy a general rule which would be applicable to all cases of this character which might arise; but the result of the best considered cases on this subject may be generally stated to be that, where it appears that the party sought to be charged, intended to bind himself by some obligation in writing, and voluntarily signed his name to what he supposed to be the obligation he intended to execute, having full and unrestricted means of ascertaining for himself the true character of such instrument before signing the same, but by his failure to inform himself of its contents, or by relying upon the representations of another, as to the contents of the instrument presented for his signature, signed and delivered a negotiable note in lieu of the instrument intended to be signed, he cannot be heard to impeach its validity in the hands of a bona fide holder."

We are cited by appellants' counsel to the case of Yakima Valley Bank v. McAllister, 37 Wash. 566, 79 Pac. 1119, 1 L. R. A. (N. S.) 1075, 107 Am. St. Rep. 823. A reading of that authority, however, discloses that the doctrine of negligence treated in the foregoing cases is recognized as preventing the maker from escaping liability in an action by an innocent holder. It was held in that case there was in fact no indorsement of the paper there sued upon, as it was merely secured by a trick inducing him to sign his name to a paper placed upon the note in such a way that the ink penetrated through to the note without his knowledge or in-

tent. Authorities of that character are without application here.

[4] It is without dispute that the Moores intended to give their indorsement to a draft, a negotiable instrument, and they indorsed a paper of the exact character which they intended to indorse, except as to the amount.

Applying the foregoing principles to the facts of this particular case, the question arises, Was the matter of negligence on the part of the Moores properly submitted for the jury's determination? We are of the opinion it was. The evidence discloses that they trusted Olcott, a stranger, and had implicit confidence in him. While Mrs. Moore testified that they read the draft, yet the jury could infer from the evidence that they in fact handled it very little; this being left largely with Olcott. It could also be inferred that they read while he held the draft. Just a few days previously they had given him a check in exchange for a $10 bill, upon the pretense that he wished to send it through the mail, and yet he was representing by this draft as having funds in the First National Bank of Richmond, Va. If the $15 draft was pasted over the draft in question, as argued by counsel for appellants, it was only slightly so at the two corners, as hereinabove described; and certainly the jury could infer that it did not require very close examination to discover this fact. Our examination of the draft further confirms that view.

In any view of the case, therefore, we are of the opinion that the jury could infer the Moores simply trusted too greatly a stranger, were guilty of negligence with reference to the indorsement of this negotiable instrument, and must therefore bear the consequences of their own credulity and want of caution. We are of the opinion the evidence brings the plaintiffs within the influence of the maxim that, when one of two innocent persons must suffer by the fraud of a third, he shall sustain the loss who put in the power of a third to occasion it.

We have examined the cases cited by counsel for appellants, together with some additional authorities cited in the note to 1. R. C. L. 1034. We recognize the diversity of opinion among the courts touching cases of this character, and find particularly a difference of view concerning the application of the principle in cases such as Winter-Loeb v. Pool, supra; but to review these authorities would serve no useful purpose. In giving application to the principle of negligence in the instant case, we think we but follow in the wake of the decisions of this court, hereinbefore noted. Indeed, we are inclined to the view that a stronger case of negligence is here presented than in the case of Winter-Loeb v. Pool, supra, and Holmes v. Bank of Ft. Gaines, supra. However that may be, we are clear to the view that it could not be said as a matter of law they were guilty of no negligence, and therefore entitled to the affirmative charge.

[5] While there are several assignments of error, yet, as we read and understand the brief of counsel for appellants, the refusal of the affirmative charge presents the only question argued in brief, and so it appears counsel for appellee have so considered the case. We have treated it likewise, considering all other assignments as waived.

Finding no error in the record, the judgment of the court below will be here affirmed.

Affirmed.

ANDERSON, C. J., and SAYRE and MILLER, JJ., concur.