[Civil No. 2476.  Filed November 22, 1926.]

[250 Pac. 766.]

N. B. KEARBY, Appellant, v. WESTERN STATES SECURITIES COMPANY, a Corporation, Appellee.

Messrs. Anderson, Gale & Miller, for Appellant.

Messrs. Sloan, Holton, McKesson & Scott, for Appellee.

McALISTER, C. J.—This is an action in replevin, and the sole question presented is whether defendant, N. B. Kearby, or plaintiff, the Western States Securities Company, has the better title to a Flint automobile, both claiming through the Lancaster Motor Company, a retail automobile dealer in the city of Phoenix, Arizona. Kearby's right is based upon a direct purchase of the car and the Motor Company's upon an assignment of a conditional sales contract covering the car and reserving title thereto in the seller, or its assigns, until the full purchase price is paid, and of an installment note for $972.79 for the deferred payments, the contract and note being dated September 4, 1924, and executed by one Lowell Baumgardner.

On April 4, 1925, the Western States Securities Company filed this action against N. B. Kearby for possession of the car and damages for its wrongful detention, or, in case delivery could not be had, for its value. Kearby answered, with a general denial and alleged among other things that he had purchased the car from the Lancaster Motor Company in the regular course of business, for a valuable consideration; that, at the time be bought it, it was a part of the stock offered for sale by the Lancaster Motor Company and was mingled with such stock and exhibited as a part thereof; that it bore the dealer's license plates used by the Lancaster Motor Company and was used as a demonstrator; that plaintiff claimed the right of possession through an assignment to it of a conditional sales contract signed by Lowell Baumgardner, who was a salesman for said Lancaster Motor Company; that plaintiff had the means of knowing and, in fact, did know that the foregoing facts were true; that defendant believed and had a right to believe that the car was a part of the stock belonging to the Lancaster Motor Company and being offered for sale by it, and had no knowledge whatever or means of knowing that it was anything else; that, by reason of these facts, the plaintiff is estopped from asserting title to the car as against the defendant. In its reply, plaintiff denied the allegations of the answer by which it was intended to plead an estoppel.

To establish the issues raised by its pleadings, the Western States Securities Company introduced evidence showing that its business was that of financing automobile dealers; that it purchased the note and conditional sales contract signed by Lowell Baumgardner, from the Lancaster Motor Company, on the day they were executed; that the contract and the assignment thereof were soon thereafter recorded in

the office of the county recorder of Maricopa county and Baumgardner notified of the sale and assignment; that the monthly installments of $81.60, up to and including that of January 4, 1925, were paid through the Lancaster Motor Company, but that the balance of the contract, amounting to $588.55, was and still is unpaid, though three notices of the installment due February 4, 1925, had been sent Lowell Baumgardner, the last one having been returned as unclaimed; that, upon investigating the reason for the failure to pay this installment, plaintiff learned about the middle of March, 1925, that the car was no longer in the possession of Baumgardner, but was held by N. B. Kearby who had purchased it from the Lancaster Motor Company.

To sustain the issues on his part, Kearby proved that on December 3, 1924, Baumgardner drove the car to where he was boarding in Phoenix for the purpose of selling it to him, but that he was not at home; that he came again the next evening about 7:30 and took him for a ride in the car; that it had a dealer's license plate on it; that he stated to appellant that it was a demonstrator car and that Mr. Hughes, the manager of the Lancaster Motor Company, told him to sell it to appellant for $1,295, discount this amount $150, take his note for the cash payment of $285, and a conditional sales contract for the balance of $860, payable in monthly installments; that they went in the car to the Lancaster Motor Company's place of business to see Mr. Hughes, the manager, and drove inside the garage where there were other cars of the company with dealer's license plates upon them; that Mr. Hughes confirmed the offer made by Baumgardner, and appellant bought the car upon the foregoing terms; that he believed from what he saw, as well as heard from Hughes and Baumgardner, that the car belonged to the Lancaster Motor Company,

and at no time did anything happen to lead him to think otherwise; that he did not know of the sale to Baumgardner until some time in March, 1925, when he received a letter from the plaintiff claiming the car, and that by this time he had made substantial payments thereon; that plaintiff knew, when it purchased the conditional sales contract signed by Baumgardner, that he was a salesman for the Lancaster Motor Company, that the car was being used as a demonstrator, and that the usual custom was to sell demonstrator cars after they had been run for a while; and that, though the purchaser's statement said it would usually be kept at his residence in Tempe, it might be kept in the Lancaster Motor Company's place of business during the daytime. Such knowledge on the part of the plaintiff appeared from the following admission, upon cross-examination, of Robert Rae, plaintiff's manager:

"I suppose I must have known that Mr. Baumgardner was a salesman for the Lancaster Motor Company. I suppose I must have known that he was up there. I probably knew that he was using this car for a demonstrator. I know the usual custom of business for automobile dealers to sell the cars they use for demonstrators. . . . According to the statement, the car was supposed to be kept at Tempe. I never had any knowledge other than it was to be kept in Tempe. I never had any knowledge of the car not being kept in Tempe at the residence of Lowell Baumgardner other than the fact that it was used as a demonstrator or might be in the Lancaster Motor Company's place of business during the daytime. From my knowledge of the automobile business, I have knowledge of the practice of automobile dealers as to the handling of demonstrators that salesmen use. Usually, when a man goes to work for an automobile dealer, the first thing he has to do is to buy a car, and it is taken up on a time sales contract—conditional sales contract similar to this.

After they have run that car a certain period of time, they will sell it and get a new one. That transaction is handled with the knowledge of the assignee of the contract.''

It further appears that all payments on the car after the assignment were made by the Lancaster Motor Company, though these were charged to Baumgardner on the books of that company.

At the close of the testimony, plaintiff moved for a directed verdict, and the court granted it as to the possession of the car, but submitted the question of the car's value to the jury which, by its verdict, said it was worth $600. The plaintiff elected to take the latter, and judgment in its favor for $600 against the defendant and the surety on his redelivery bond was entered. The defendant has appealed from the order directing a verdict, his contention being that he was entitled to the car or, at least, to have this question submitted to the jury. The pleadings and the proof are more in detail, but the foregoing sufficiently states their substance to present the issues involved.

The chief proposition of law raised by the assignments and relied on by appellant is stated by him in this language:

''Where a dealer sells an automobile on conditional sales contract to his salesman, and the dealer assigns the contract, reserving title to said automobile until the purchase price is paid, to an automobile finance company, and the finance company expressly or impliedly consents that the dealer or the salesman may resell the automobile before the full purchase price is paid, the finance company is estopped to assert the reservation of title against a purchaser for value from the dealer and the salesman, in the ordinary course of business, even though the contract of sale and the assignment are recorded.''

The further proposition is presented that, where one of two innocent parties must suffer from the

wrongful act of a third and one of these has placed it within the power of the wrongdoer to commit the wrongful act, the one who made such act possible must bear the loss. 10 R. C. L. 695, par. 23.

Appellee's ownership of the car from the date of the sale and assignment of the note and conditional sales contract executed by Baumgardner is unquestioned. That contract reserved title to the car in the Lancaster Motor Company until, the full purchase price was paid, and the effect of the assignment was to vest such ownership in appellee from that moment. *Western States Securities Co.* v. *Mosher,* 28 Ariz. 420, 237 Pac. 192; *Van Marel* v. *Watson,* 28 Ariz. 32, 235 Pac. 144; *State Bank of Black Diamond* v. *Johnson et al.,* 104 Wash. 550, 3 A. L. R. 235, 177 Pac. 340. And, necessarily, the Motor Company had no interest in it thereafter, unless, perchance, it had been called upon to pay the notes it had guaranteed, and, in that event, the contract would doubtless have been reassigned to it, whereupon it would have again become the owner of the car and could have repossessed it. But, notwithstanding title to the car passed to the Securities Company with the assignment, the question arises whether this company did not thereafter, by its action in permitting Baumgardner to retain possession of the car, knowing it was to be used by him as a demonstrator for the Motor Company (in whose employ he was then, to the knowledge of appellee, engaged as a salesman) and within a short time thereafter sold, place it within the power of the Motor Company and Baumgardner to sell the car and give good title, at least one the Securities Company could not attack. Appellant contends that such was the effect of the Securities Company's action, while the latter insists that it was not.

The Securities Company, according to the testimony in its behalf, required that any conditional sales contract held by it be taken. up in full whenever

the car covered by it was resold and that the new sale be handled through it. Hence it takes the position that, if the agent and the dealer resold the car without its knowledge and failed to pay the amount due it, it should not be estopped from asserting its title as against the purchaser, since it could not foresee that they would be guilty of such fraudulent conduct. If, however, it consented to or authorized, even impliedly, a resale of the car by the Motor Company and Baumgardner, the fact that they failed to turn in the amount due it would not prevent an estoppel from arising in favor of a purchaser who had neither actual nor constructive knowledge of its title. There is, it is true, nothing in the conditional sales contract specifically conferring upon either the Motor Company or Baumgardner the right to resell the car, but the fact, testified to by appellee's manager, that, if a resale should be had, the amount due the Securities Company should be taken up in full and the resale handled through it indicates that such a sale was contemplated by the parties. And when you consider the further fact that appellee's manager admits that he knew, when the assignment was made and Baumgardner permitted to retain possession of the car, that it would be used as a demonstrator for the Lancaster Motor Company, for whom he was working as a salesman, and would be kept for this purpose at its place of business during the daytime and, in accordance with custom, sold within a short time thereafter to a third party, the only fair inference to be drawn, it occurs to us, is that there was an implied understanding between the Securities Company upon the one hand and the Motor Company and its salesman, Baumgardner, on the other that the latter might resell the car. Hence the validity of the title the purchaser at such a sale would receive could in no way be affected by the fact that

neither the Motor Company nor Baumgardner accounted to the Securities Company for the money realized from the sale. Since they were authorized to sell, it was not incumbent upon him to see that this was done. As said by the court in *Anglo-California Trust Co.* v. *Pacific Acceptance Corp.*, 70 Cal. App. 41, 232 Pac. 489:

"Nor is this principle affected or in anywise altered because of the fact, as here, that the agent has been unfaithful to his trust and embezzles or fails to account for the proceeds to his principal. The consequences of a betrayal of trust should fall upon him who reposes it, rather than upon innocent strangers. 35 Cyc. 363; 39 Cyc. 373. Where a principal not only trusts an agent with the possession of property, but also clothes him with apparent ownership or power of sale, he will not be permitted to deny the agent's authority as against third persons who have dealt with him in good faith and with reasonable prudence. *Carpy* v. *Dowdell*, 115 Cal. 686, 47 Pac. 695; 31 Cyc. 1353."

Even though there was an understanding that any resale should be handled through the Securities Company and that its contract, in such event, should be taken up in full, yet, by permitting the car to be sold in the way it did, it took the risk that this might not be done, and, consequently, it would seem to be only fair that it, rather than an innocent purchaser, should bear the loss which a dealer, it had financed, occasioned by its failure in this respect. It had, for a profit, assumed some risk as to the Motor Company's moral and financial standing. The following statement of the court in *Gump Inv. Co.* v. *Jackson*, 142 Va. 190, 128 S. E. 506, regarding a somewhat similar situation, applies very forcibly:

"One conclusion is that some duty, at least, rests upon an individual, corporate or otherwise, who finances a retail dealer, to see to it that cars upon which he has a lien are not left under the domain

and control of such dealer, on his salesroom floor, to be offered to the public. The business of the Gump Investment Company was to finance retail automobile dealers, and it did finance them for a profit. It assumed some risk both as to the moral and financial standing of every dealer it financed. It took a risk as to the hazard for a profit. This is the status of the Gump Investment Company in this case.''

But, if there was any doubt as to whether the Securities Company gave the Lancaster Motor Company and Baumgardner the actual power to resell, there can be but little, if any, question that, under the foregoing admissions, it clothed them with the apparent power to do so, and that anyone dealing with either or both of them regarding the car would be justified in assuming that the Motor Company owned it and had a right to sell it. The car, when Kearby first saw it, was being driven by Baumgardner and carried the dealer's license plate used by the Lancaster Motor Company, something the Securities Company must, from the testimony of its manager, be presumed to have allowed. Baumgardner had called on him at his boarding place in Phoenix to demonstrate it and, after doing so, drove it, accompanied by appellant, to the Motor Company's garage where it was placed among the other cars of that company bearing similar license plates and being displayed to the public. It was offered to him, first by Baumgardner, and then by the Motor Company, at a discount of $150 because it had been used some as a demonstrator. Nothing occurred then or at any other time to lead him to suspect even that the Motor Company did not own the car or have a right to sell it. In fact, the circumstances were such that it clearly appeared to him that the car was being sold by the Motor Company, in the ordinary course of business, and a fair construction of the testimony of appellee's manager is that it

permitted this situation to exist. Hence the recordation of the contract and its assignment did not constitute notice to Kearby, nor did the well-settled principle, that one can transfer no better or superior title than he himself has, apply, but, rather, the exception thereto, which is well stated in 24 R. C. L. 379, in this language:

"Where the true owner holds out another or allows him to appear as the owner of or as having full power of disposition over the property, and innocent third persons are thus led into dealing with such apparent owner, they will be protected. Their rights, in such cases, do not depend upon the actual title or authority of the person with whom they deal directly, but are derived from the act of the real owner, which precludes him from disputing, as against them, the existence of the title or power which, through negligence or mistaken confidence, he caused or allowed to appear to be vested in the person making the transfer."

In holding that the recordation of the contract and assignment does not constitute notice to a purchaser for value, and without actual knowledge of the existence of a lien upon the car, the court, in *Gump Investment Co.* v. *Jackson, supra,* made the following very apt and correct observation:

"Another conclusion is that a person going into the place of business of a retail automobile dealer and purchasing a new car commingled with the stock for sale, from the showroom of such dealer, without any actual knowledge that there is a lien upon such car, and who pays the full purchase price, and to whom the car is delivered, is ordinarily under no obligation to examine the records to ascertain whether there is a lien upon such car. This is the status of W. N. Jackson, in the instant case."

The other proposition presented by appellant is, to our minds, also applicable. While it is true that the Securities Company and Kearby may both be re-

garded as innocent, they are not equally so, in view of the fact that the former, after becoming the owner of the car through the assignment, permitted a condition to exist that made it possible, if appellee's contention should prevail, for Baumgardner and the Motor Company to defraud appellant. Authorizing Baumgardner, who was allowed to retain possession of the car after the assignment, and the Motor Company, which guaranteed the payment of the amount due under the conditional sales contract, to sell it would have this effect, for no one confronted with the situation facing appellant when he purchased the car would have thought for a moment of questioning the Motor Company's ownership or right to sell and give good title, and to hold that, under such' circumstances, he should bear the loss would work a grave injustice. We think the maxim that, when one of two innocent persons must suffer by the fraud of a third, the one who puts it in the power of the third, to occasion the loss must bear it, applies, and, therefore, that appellee is estopped from setting up his title as against appellant's. *Moore et al.* v. *First National Bank of Birmingham,* 211 Ala. 367, 34 A. L. R. 526, 100 South. 349; *Gafford Lumber & Grain Co.* v. *Eaves et al.,* 114 Kan. 576, 220 Pac. 512.

It follows that the motion for a directed verdict in favor of appellee should not have been granted. The judgment is reversed and the cause remanded, with instructions to enter judgment for appellant.

ROSS and LOCKWOOD, JJ., concur.