60 P.(2d) 635

SHEPHARD v. VAN DOREN.

No. 4068.

Supreme Court of New Mexico.

Aug. 11, 1936.

Rehearing Waived Sept. 15, 1936.

J. C. Gilbert, of Roswell, for appellant.

H. C. Maynard, of Roswell, for appellee.

SADLER, Chief Justice.

This appeal is for review of a judgment in replevin. The plaintiff, who prevailed below, does business at Plainview, Tex., in the name of Shephard Chevrolet Company, conducting an automobile agency, selling new and used cars. He sold to one C. H. Little a certain used Chevrolet automobile, 1931 model, bearing engine number 2456779, under a conditional sales contract, duly filed with the county clerk in Lamb county, Tex., county of the purchaser's residence, so as to constitute constructive notice of plaintiff's contract. Under the laws of the state of Texas, the conditional sales contract was the equivalent of a chattel mortgage in plaintiff's favor on the automobile in question.

Little, original purchaser, placed the automobile in possession of one Leo Parks, who transported same to Roswell and there had the motor number changed from 2456779 to 1392476. Parks subsequently pleaded guilty before the district court of Chaves county to a criminal offense involving this alteration of the engine num-

bers and received a sentence which was suspended. After this change in numbers, the car came again into possession of Little, who returned it to Texas. While there the plaintiff checked same and finding it to be the identical car theretofore sold Little, but with the motor number changed, made notation of the change in motor number on his (plaintiff's) copy of the conditional sales contract and redelivered same into Little's possession. Little returned it into Park's possession. The latter took the car to Roswell, where he sold it to one Carl Johnson, who in turn sold same to Elwood Van Doren, the defendant herein. Neither Johnson nor Van Doren had actual knowledge of plaintiff's lien at the time of their respective purchases.

Little having defaulted in meeting the payments due under his purchase contract, and the plaintiff's right to possession arising by its terms, he located the car with defendant and demanded its return to him. Possession being refused, he instituted this action in replevin. From a judgment in his favor, the defendant prosecutes this appeal.

While several points are presented and argued, only one of them need be considered, since it appears decisive. It is, in substance, that plaintiff's act, after regaining possession of the automobile bearing a false engine number, in restoring the automobile to the original purchaser still bearing such false and altered number, denied to any subsequent good-faith purchaser the intended means of connecting it with plaintiff's conditional sales contract; and that by reason thereof the plaintiff is estopped from asserting his lien against such a purchaser.

The trial court of its own motion made findings as follows:

"On the date of the purchase of said automobile by C. H. Little, the plaintiff gave to C. H. Little a bill of sale thereto and at the same time and a part of the same transaction C. H. Little gave to the plaintiff the conditional sales contract heretofore mentioned which, under the laws of the State of Texas is a mortgage.

"That the said C. H. Little turned the said automobile over to one Leo Parks, who brought the same to Roswell, New Mexico, and while in Roswell, New Mexico, had the motor number to said car changed from 2456779 to 1392476.

"Thereafter, one Carl A. Johnson bought from Leo Parks the said automobile paying therefor a valuable consideration without actual knowledge of any interest of the plaintiff in and to said automobile.

"Thereafter the said Carl A. Johnson sold to the defendant the automobile in question and the defendant had no actual knowledge of any claim, right, title or interest of the plaintiff in and to said automobile. That both Carl A. Johnson and the defendant were purchasers in good faith believing the said Leo Parks was the owner of said car.

"That the conditional sales contract from the plaintiff to Little heretofore mentioned was duly filed for record in the chattel

mortgage records of Lamb County, Texas, on the 21st day of June 1932.

"That under the laws of the State of Texas the filing of such conditional sales contract (or chattel mortgage as it is under the laws of the State of Texas) is constructive notice to all the world as to its contents."

The defendant requested, and the trial court made, the following findings touching the issue under discussion, to wit:

"That subsequent to the original sale of said automobile by plaintiff to C. H. Little, and prior to the purchase of said automobile by the defendant, the engine therein had been changed or the numbers on the engine therein had been changed from 2456779 to 1392476 of which fact plaintiff had full knowledge, and that plaintiff after such change in engine or numbers had been made, had said automobile in his or its possession and noted on the original conditional sales contract, which he had in his possession such change in numbers, and thereafter allowed said automobile to go out of his possession and back to the possession of said C. H. Little, and that at the time of the purchase of said automobile by the defendant there was no record in any county in the State of Texas that plaintiff had a conditional sales contract with anyone on an automobile with an engine in the same numbered 1392476, and that defendant had no knowledge constructive or otherwise of such engine change or number changes.

"That at the time of the purchase by defendant of the automobile in question from Carl Johnson, the engine in said automobile was numbered 1392476, and that the plaintiff had knowledge that the engine in said car had such number, and that he had no conditional sales contract on record in the State of Texas with anyone upon an automobile bearing engine number 1392476."

The two findings just quoted stand before us unchallenged by any exception on plaintiff's part. Read in connection with other findings of the court, it must be taken as the fact that no substitution of the engine occurred, only the identifying numbers thereof being changed. Indeed, Parks, charged with having altered the motor numbers, pleaded guilty to having done so and received a suspended sentence therefor.

We have then this situation: The plaintiff, by instruments duly executed and filed for record in Lamb county, Tex., has a lien on a certain 1931 model Chevrolet automobile, bearing engine number 2456779. We may assume for purposes of our decision, as contended by the plaintiff and held by the trial court, that pursuant to the holding in Hart v. Oliver Farm Equipment Sales Company, 37 N.M. 267, 21 P. (2d) 96, on the facts here shown and under ordinary conditions, this lien would be recognized and enforced in New Mexico. Subsequent to reservation of the lien the automobile comes back into possession of the mortgagee bearing a false engine

number. With knowledge that such is the case, the mortgagee, after noting the false number on his copy of the contract or mortgage, redelivers the car into original purchaser's possession, and thereafter it passes into the hands of one who pays value without actual knowledge of any claim, right, title, or interest of the plaintiff in and to said automobile.

Is the mortgagee under such conditions in position to assert the lien of his mortgage against said good-faith purchaser? We hold him estopped from doing so.

■ For purposes of identification in chattel mortgages and conditional sales contracts, the make, model, and engine number of automobiles are almost universally employed in describing the property mortgaged.

"A description of mortgaged automobiles by the make and engine number completely and absolutely identifies them, since that is all that is necessary to impart constructive notice to subsequent purchasers." 7 Blashfield's Cyclopedia of Automobile Law and Practice. (Permanent Edition) § 4684, p. 314.

"It is common knowledge, and the uncontradicted evidence shows, and the jury would have been warranted in finding, that automobiles of various mechanical designs, made by numerous manufacturers under multiform trade-names, are constantly in the market for purchase and sale, and that cars of any one of the makers can be distinguished with reasonable certainty from other automobiles of the same class, only by the number by which each car is designated." Wise v. Kennedy, 248 Mass. 83, 142 N.E. 755, 756.

It is well settled that "where the descriptions given are intrinsically false and misleading, the mortgage given thereon is not valid." 7 Blashfield Cyclopedia of Automobile Law and Practice (Permanent Edition) § 4684, p. 312; McQueen v. Tenison (Tex.Civ.App.) 177 S.W. 1053; First National Bank v. Gardner, 222 Mo.App. 858, 5 S.W.(2d) 1115; Shearer v. Housch, 32 Ga.App. 663, 124 S.E. 356; First Mortgage Loan Co. v. Durfee, 193 Iowa, 1142, 188 N.W. 777; Becker v. Dalby (Iowa) 86 N.W. 314.

One of the chief objects of particularity in description is to enable a prospective purchaser or incumbrancer to identify the tendered property as that previously mortgaged. If this purpose is to be fully served, the description in the mortgage and that borne by the property should be found in continuous reconcilement throughout the life of the mortgage. To say the least, this purpose is wholly defeated if the identifying marks on the property are so altered or changed that a comparison of same with the description in the mortgage not only fails to establish it as the same property, but leads to the false conclusion that it is different property.

■ We are not to be understood as intimating that a mortgagee, as the price of preserving his lien, is an insurer of the continuing sameness of the description in the mortgage and that borne by the prop-

erty. It would be a harsh rule which imposed any such duty, particularly where, as in most instances, he is not in possession of the property and changes or defacement of descriptive marks on the property most often would be made for the very and fraudulent purpose of defeating his lien. Where he is in no sense responsible for the continued circulation in channels of trade or commerce of the property bearing false identification marks, his rights will be wholly unaffected by subsequent dealings in such property, no matter how good or strong the faith of him who deals in reliance upon the truth of false descriptive marks.

It is only where some act of the mortgagee or conditional vendor, as in the instant case, aids in destroying the intended purpose of registration or recording acts, that the consequences of estoppel will attach. Let us apply this statement to the present facts. We assume that defendant, under doctrine of Hart v. Oliver Farm Equipment Sales Company, supra, stood charged constructively with notice of plaintiff's lien upon the automobile in question. The harshness of this rule as operative against subsequent purchasers without actual knowledge is tempered by the *legal fiction* that knowledge of the prior mortgage is present in the purchaser's mind, and having this constructive notice, by mere comparison of descriptions he is in legal contemplation forewarned of danger in dealing with the property. But even the theory of liability based on constructive notice fails if the descriptive and identifying marks on the property are changed.

And so, according defendant's mental processes to the theory of constructive notice, the comparison of descriptions presupposed by such theory, instead of warning that he is purchasing the mortgaged car, will prove quite satisfying that he is not.

Or, if we assume knowledge of facts sufficient to have prompted an inquiry of the recorder's office in Lamb county, Tex. (an assumption contradicted by the court's finding that defendant was a good-faith purchaser without knowledge "constructive or otherwise" of the change in engine numbers), the result does not vary. An actual search of the records there would have disclosed no lien on a 1931 model Chevrolet coupé with engine number 1392476, the false number borne by the engine in question at the time of defendant's purchase and which in good faith he relied upon as the true number.

Under authorities hereinabove cited, the use in the original contract of this false description of the mortgaged automobile would have rendered the mortgage invalid in its inception as against a subsequent purchaser in good faith. Does it operate less effectively to this end against such a purchaser where the mortgagee having possession of the automobile, with knowledge of the false and fraudulent change in engine number, and without removing the false and restoring the true number, redelivers possession to the pur-

chaser in whose hands it may become the subject of sale, barter or exchange? We hold it does not.

The defendant, citing Harrison v. Auto Securities Co., 70 Utah, 11, 257 P. 677, 679, 57 A.L.R. 388, relies upon the principle there applied in the following language in favor of an innocent purchaser of a mortgaged automobile, to wit: "The trial court was of the opinion that it appears from this record that one of two innocent parties must suffer from the wrongful act of a third person, and that the loss should fall upon the one who by his conduct created the circumstances which enabled the third party to perpetrate the wrong and cause the loss, and determined the case on that principle of law. The rights of the parties, in our judgment, could well be ruled upon this general principle of law, and, so ruled, would entitle plaintiff to recover."

This well-known rule is stated under the text treatment of the subject of Estoppel in 21 C.J. 1170, as follows: "Whenever one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss must sustain it."

In the Harrison Case from Utah from which we have just quoted, the court was dealing with a question upon which there is some conflict of authority, viz., whether the purchaser of an automobile from the place of business of a retail automobile dealer where it is mingled with the stock for sale from the showroom of such dealer is constructively charged with notice of a prior recorded lien upon such automobile. Without indicating a preference for one or the other of these conflicting views, since no such case is before us, we may say that we consider the reasoning which Mr. Blashfield urges in support of an estoppel in favor of the innocent purchaser in such situation to apply with particular force in the case before us. He writes: "There is thus a conflict between decisions resting on the letter of the statute on the one hand and decisions resting largely upon considerations of substantial justice and public policy on the other. There can be no question that the rule of estoppel, in cases in which the one relying on the statute has himself afforded the opportunity to a dealer to sell the automobile in controversy in the regular course of trade, will better accord with fundamental ideas of justice. The Gordian knot has been cut in some jurisdictions by holding that there can be no conditional sales of automobiles to dealers where they are to be resold." 7 Blashfield's Cyclopedia of Automobile Law & Practice (Permanent Edition) § 4595, p. 240.

These statements of principle control the rights of the parties in the case before us. Strictly speaking, it is difficult to think of plaintiff as wholly innocent. Not that he became particeps criminis to the unlawful act of changing the motor number. But rather because with knowledge that the unlawful act had been done, and with opportunity at hand to avoid its consequences by effacing the false and restoring the true

number, he mistakenly and carelessly thought it best or was content himself to adopt the false number as a future means of identifying the mortgaged car. He thereby sent it out bearing known false insignia and is thus estopped to dispute the title of one purchasing in reliance upon the false as genuine.

As to degrees of innocence, the case is more like that of Kearby v. Western States Securities Co., 31 Ariz. 104, 250 P. 766, 769, where the court said: "The other proposition presented by appellant is, to our minds, also applicable. While it is true that the Securities Company and Kearby may both be regarded as innocent, *they are not equally so,* in view of the fact that the former, after becoming the owner of the car through the assignment, permitted a condition to exist that made it possible, if appellee's contention should prevail, for Baumgardner and the Motor Company to defraud appellant." (Italics ours.)

In reaching the ,conclusion we have, importance is attached to the fact of plaintiff's possession of the car after knowledge of the fraudulent change in numbers and his release of same to Little still bearing the false engine number. It is suggested that, contrary to the language of the trial court's finding, the plaintiff's possession of the car was nothing more than storage for a short period such as might have been had of any stranger's car, without the control carried by repossession of mortgaged property.

It may in fact have been so, but we are controlled by the finding actually made. Little did not testify and the plaintiff's testimony was equivocal. He stated, "The car was returned to us"; that he (Little) brought it to plaintiff's garage and "turned it over" to the plaintiff. On the other hand, he stated just following the testimony last quoted: "I never did take possession of it; he just brought it in there, said he had found his car and he had it back."

Plaintiff testified that the car was in Plainview about half a day when Little returned it, and that during such period he and his employees removed various parts from the engine in the search for secret numbers carried by the car, which they discovered, thereby establishing it to be the same and not a substituted engine. Under the terms of the conditional sales contract, plaintiff was entitled to possession not only for default in making payments called for by the contract or removal of the property without seller's written consent from county of purchaser's residence, but also if "the seller deems the property in danger of misuse or confiscation."

In view of these considerations and the acts done in reference to the car while in his possession, it was for the trial court by its findings to characterize the nature of plaintiff's possession. Having found that after the fraudulent change in engine numbers and with knowledge thereof the plaintiff had the car in his possession and "thereafter *allowed* (italics ours) said automo-

bile to go out of his possession and back to the possession of C. H. Little," we must give the word "possession" the meaning which the language of its context plainly implies.

, [6] Nor—in view of the trial court's finding that defendant was a good-faith purchaser "believing the said Leo Parks was the owner of said car," without "actual knowledge of any claim, right, title, or interest of the plaintiff in and to said autobile," and "without knowledge constructive or otherwise of such engine change or number changes"—are we permitted to inquire whether notwithstanding the change in numbers, there were other facts sufficient to excite inquiry which pursued would have disclosed knowledge of plaintiff's lien.

■ A person cannot be a "bona fide purchaser" who has brought to his attention facts which should have put him on inquiry, an inquiry which, if pursued with due diligence, would have led to knowledge of a lien on or adverse interest in the property. Wafer v. Harvey County Bank, 46 Kan. 597, 26 P. 1032; Mangum v. Stadel, 76 Kan. 764, 92 P. 1093; Manwaring v. O'Brien, 75 Minn. 542, 78 N.W. 1; Williamson v. Brown, 15 N.Y. 354, 362; LaBrie v. Cartwright, 55 Tex.Civ.App. 144, 118 S.W. 785; Harvey E. McHugh, Inc., v. Haley, 61 N.D. 359, 237 N.W. 835; Wilkins v. McCorkle, 112 Tenn. 688, 80 S.W. 834.

It follows that the judgment of the trial court must be reversed, and the cause will be remanded, with a direction to the trial court to set aside the judgment heretofore entered and to render judgment in defendant's favor upon the issues joined and for his costs. It is so ordered.

BICKLEY and ZINN, JJ., concur.

BRICE, J., did not sit in this case and does not participate in the decision.

HUDSPETH, Justice (dissenting).

The defendant in this case throughout the trial maintained that Leo Parks bought an engine numbered 1392476 from O. B. Thompson and had that placed in the Chevrolet car involved in this case. The counsel for the defendant-appellant, while Carl A. Johnson was on the stand, stated: (Tr. 117) "If the court please Mr. Johnson is the man who bought this car and sold it to Mr. Van Doren, and he is the man that will have to pay Mr. Van Doren for the value of it."

Johnson testified: "There wasn't any changed numbers on the car; here's the motor he bought and put in there," and that he knew Leo Parks, from whom he bought the car, had received a suspended sentence for changing numbers on an engine.

There appears in evidence an affidavit sworn to before Carl A. Johnson, notary public, as follows:

"Used Car Dealer    Short Time Loans
        "Established 18 years
    "Carl Johnson
    (Of Course)
        "Roswell, New Mexico
            "11–26–32

"To Whom it may Concern:

"This is to certify that on or about the 1st day of September I placed a Chevrolet motor bearing engine No. 1392476 in a Chevrolet coupe at the request of Mr. Leo Parks who presented to me a bill-of-sale for the above described car, signed by O. B. Thompson, a dealer in Junk parts in Roswell, New Mexico. This motor replaced engine No. 2456779.

"This affidavit is made for the purpose of assisting Mr. Parks in securing license for the above described car in the State of New Mexico for 1933.

        "[Signed] A. E. Howard

"Subscribed and sworn to before me this 26th day of 1932.

        "Carl A. Johnson
"(Notarial Seal)        Notary Public.

"My commission expires July 22, 1933."

Thompson testified as follows:

"Q. This number is 1392476? A. Yes, sir, that is the motor I sold him.

"Q. Who did you get that motor from? A. I just couldn't say the man's name, but I got that from a man at Hobbs, and through the way I happened to buy the motor I didn't get to see the man when I got it, to get a bill of sale and the papers on it."

Leo Parks was also a witness for appellant. He admitted having served a term in the Colorado penitentiary. He had no bill of sale from Little, and his testimony as to the ownership follows:

"A. Well, sir, it was on August 18, '32, I came home and Charlie Little was there in the morning, and had give this car to my wife.

"The Court: Where was this?

"A. Clovis, New Mexico, sir, and he then gave me what papers he had on the car, the license receipts, brake receipts, light receipts, and said that later he would send me a bill of ·sale, just as soon as he went home and got it, and I told him I could not wait that long, because I was going on through to California, that I would come out there, after I got there he could write or send it down to me, or anyway at all.

"The Court: Send it where?

"A. To California. On the way down here I burned the engine out, and I came down here and I bought an engine from Mr. Thompson on North Main * * *."

Does the finding in the alternative that "the engine therein had been changed or that the number on the engine therein had been changed," under the facts and circumstances, meet the requirement of specifically calling to the attention of the trial court the claimed error? It has been held that a point not raised or insisted upon at the trial cannot be urged before us. Chaves v. Myer, 13 N.M. 368, 85 P. 233, 6

L.R.A.(N.S.) 793; James v. Board of County Commissioners, 24 N.M. 509, 174 P. 1001. In his brief in this court appellant repeatedly refers to the change of motors. There is no specific assignment of error based upon the change in the number of the motor.

It is also the rule here that "if there are doubts as to the meaning of any finding," that must be resolved in support of the judgment. Zack Metal Co. v. Torpedo Copper Co., 17 N.M. 137, 125 P. 625, Ann. Cas.1914D, 1183; Guaranty Banking Corp. v. Western I. & B. Co., 28 N.M. 19, 205 P. 728; James v. Anderson, 39 N.M. 535, 51 P.(2d) 601. The latest text on the subject appears in 3 Am.Jur. p. 463, as follows:

"Sec. 898. Inconsistent Findings.— Where findings of fact are so inconsistent that it is impossible to harmonize them, it is the duty of the appellate court to accept those which are most favorable to the appellant. And where there are two possible constructions of a finding of fact made by the trial court, the appellate court will adopt the one which renders such finding consistent with the evidence and with the other findings, rather than one which makes it contrary to the evidence and to repeated concessions by both parties on the trial. In other words ambiguous findings will be given a construction which will support the judgment, rather than one which will require its reversal. It clearly will not, by construction, create an inconsistency where it is apparent that none was intended." .

"Sec. 899. Findings Contrary to, or Inconsistent with, Evidence.—The rule giving great weight in the appellate court to the finding of the trial court on a question of fact lays no restraint on the power of the former to ascertain, by full and careful investigation and analysis of the evidence, what the facts and circumstances are and whether the general finding is consistent therewith, or, in other words, whether there is any evidence to sustain the finding. The findings of the trial court will not ordinarily be disturbed, but the appellate court is not necessarily concluded thereby. Such findings have weight with the appellate court, but they are not controlling upon it unless they are supported by competent evidence. Findings not supported by any competent evidence or which disregard uncontroverted credible evidence, or which are contrary to a conclusion of law resulting from other facts found, cannot be sustained, and a judgment based thereon will be reversed. The question whether or not the facts found support the conclusions of law is one of law. If the finding is the result of bias or prejudice, mistake or misapprehension, or misconception of the legal effect of the evidence, or if the evidence shows that the judgment is clearly wrong on the sole issue of fact, it will be set aside."

On the question of the character of the "possession," it may be well to note defendant's requested finding of fact No. 11, which was refused. It reads as follows: "11. The Court further finds as a fact that the plaintiff, T. C. Shephard, exercised his

right to repossess himself of said car under the conditional sales contract recorded in the State of Texas, sometime in November 1932, by taking said car from the possession of the plaintiff's vendee, C. H. Little, and after inspecting said car and taking same apart to a certain extent, then redelivered said car back to said C. H. Little, and there was no evidence that said contract was in any way or manner renewed between plaintiff and said C. H. Little."

It appears to me that there is such doubt as to the meaning of the court as to the kind of possession referred to in the special finding that we should look to the testimony. Shephard, the appellee, testified:

"Q. Was the car ever returned to Plainview? A. Yes, sir, the car was returned to Plainview by Mr. Little. * * *

"Q. Now, this may be a little out of order, but when Mr. Little came to Texas, was the Department of Justice man after him? A. Yes, sir;' when the car was stolen, as reported by Mr. Little, the insurance company immediately took it up with the underwriter's insurance, of which I think they have a bureau, theft bureau. They thought it was an attempt to defraud the insurance company, so the Department of Justice man located the car in Roswell, and he immediately made a trip to Olton and brought Mr. Little to Plainview, and they tried to satisfy themselves as to whether there was a chance to defraud the insurance company, or whether the facts actually happened as told by Mr. Little,

and Mr. Little satisfied the Department of Justice men.

"Q. Who was present? A. Mr. Harder and myself and the Deputy Sheriff at Plainview.

"Q. Go ahead, what was done? A. The Department of Justice then told the Sheriff's Department there, and also Mr. Harder, the insurance man, that they could not find anything wrong, inasmuch as Mr. Little had made all of his payments to us on the car, and they did not see any attempt there to defraud the insurance company.

"Q. Now, Mr. Little at the time the car was reported stolen, had he made his payments? A. Yes, sir. * * *

"Q. Now, when Mr. Little brought it back over there—Did he bring it back, Little? A. Yes, sir.

"Q. He brought it down to your garage and turned it over to you? A. Yes, sir.

"Q. And you took it yourself, took the car? A. I never did take possession of it; he just brought it in there, said he had found his car and he had it back. * * *

"Q. How long did Little have that car in Plainview when he came back there with it? A. I guess about half a day. On the Chevrolet car they have a secret number, they have a few—several secret numbers; they have one under the motor—we have to take the oil pan off—and then they have identification number on the transmission; have one on the differential, and have body numbers and several different

things that the cars can be identified; so we took the pan off the car to identify the automobile, knowing where this car number is. So the number on the outside was a very good job of changing numbers, but the numbers on the inside, inside of the pan, was a very poor job, and you could tell the original numbers on the car as it was at that time, and I reckon, unless it hasn't been changed, still shows. So we drop the oil pan on the car to further identify the motor and check with original motor that was on there, so whoever changed the numbers did a very poor job on what we call our secret number. On the outside number they made an error on changing the first number. The first number on the Chevrolet automobile, inasmuch ·as they run about a million a year, the number changed on the first number counted a year's difference in model, so when they changed this to a thirty-one model, they changed it back to a number that had already come out in thirty or thirty-one, so the man identified it as being a wrecked car he had repaired. The car was traded for in January by Mr. Collier and was held there until June before we sold it to Mr. Little, so we got pretty familiar with the automobile."

It seems clear to me that the appellee had possession of the car only in the sense that he had it in his garage and made the examination to determine whether or not it was the same automobile and engine on which he had a lien. Little, the owner, who was not in arrears in his payments, voluntarily brought the car to the garage.

There must be a breach—the mortgagee cannot take possession on a mere whim. There must be some reasonable violation, or probability of violation of the terms of the mortgage. Glaspie v. Williams (Ariz.) 51 P.(2d) 254.

Apparently the majority rely upon the provision in the mortgage that if "the seller deemed the property in danger of misuse or confiscation" as authority. I am unable to follow their reasoning. I do not understand what misuse the mortgagee had a right to anticipate nor by whom the car might be confiscated. No authority is cited, and I believe this is the first time that a court has held that such a provision authorized the mortgagee to take possession where the mortgagor was merely the victim of a criminal who had changed the numbers on an engine. Little was entitled to the possession, in my judgment, and the mortgagee had no right to the possession of the car nor did he owe a duty to "innocent purchasers."

It occurs to me that the majority, by the new doctrine announced in this case, have abandoned the public policy as to chattel mortgages, as indicated by both legislative enactment and judicial decision, heretofore prevailing in this state. The Legislature in 1925 enacted a law (chapter 25, Session Laws 1925) requiring that abstracts of chattel mortgages affecting motor vehicles be filed with the secretary of state, but four years later the law was repealed (Laws 1929, c. 83). Evidently the Legislature realized that, as a practical proposition, the recording of chattel mortgages

afforded no protection to the purchaser of secondhand cars except those known locally, and deemed the county record sufficient.

The rule has heretofore been in this state that all of the description in chattel mortgages might be looked to to identify the property.

The late Mr. Justice Parker, referring to the description in a chattel mortgage, said: "Under the familiar general rule of construction, every word used by the parties to a contract must be given its full and fair meaning and operation." Vorenberg Co. v. Bosserman, 17 N.M. 433, 130 P. 438, 440. This mortgage or sales contract contained the car number as well as the engine number.

In Thompson v. King Motors, 19 La. App. 298, 140 So. 257, 259, the court said: "The evidence shows that no two cars have the same serial number or the same motor number, and either or both is sufficient to identify the car. We think the description in the judgment is sufficient to identify the car in third opponent's possession as the car upon which a lien is recognized."

Jones states the rule as to description of property in chattel mortgages as follows: "If a stranger should be sent out to select property mortgaged, with no other means of identification than such as are afforded by the written description, and without being at liberty to supplement that information by such as can be gained in the mortgagor's neighborhood by inquiry of those who know what property the mortgagor was possessed of which would answer the description in the instrument when it was given, and by possessing himself of such other circumstances as persons usually avail themselves of in applying written descriptions to the things intended, it is much to be feared that the stranger would be so often at fault that chattel mortgages, if their validity depended upon his success in identifying the property, would seldom be of much value as securities. Written descriptions of property are to be interpreted in the light of the facts known to and in the minds of the parties at the time. They are not prepared for strangers, but for those they are to affect,—parties and their privies. A subsequent purchaser or mortgagee is supposed to acquire a knowledge of all the facts so far as may be needful to his protection, and he purchases in view of that knowledge." 1 Jones on Chattel Mortgages (Bowers Ed.) p. 96. After stating that "a means of description frequently used is the giving of the make and engine number of the automobile; and if these be incorrectly given, strangers to the instrument are not affected by it," he says: "An automobile may, however, be sufficiently described in the mortgage aside from, or in addition to, the numbers given, as to render the instrument effective, when recorded, as constructive notice." Citing Iowa Sav. Bank v. Graham, 192 Iowa, 96, 181 N.W. 771; Valley Securities Co. v. De Roussel, 16 La.App. 115, 133 So. 405; Harding v. Jesse Denett, Inc. (Tex.Civ.App.) 17 S.W.(2d) 862; Mack International Motor Truck Corp. v.

Jones & Coombs, 153 Va. 183, 149 S.E. 544. 1 Jones on Chattel Mortgages (Bowers Ed.) p. 140.

In the annotation following Harris Motor Company v. Bailey, 219 Ala. 8, 121 So. 33, 63 A.L.R. 1453, a case involving a truck in which the motor had been changed, the following appears:

"As between mortgagees and purchasers, the rule, as stated by Judge Freeman in Barrett v. Fisch (1889) 76 Iowa, 553, 41 N.W. 310, 14 Am.St.Rep. at page 242, is: 'The mortgage * * * must point out the subject matter of it, so that such persons (purchasers) by it, together with such inquiries as the instrument suggests, may be able to identify the property intended to be covered.' This statement of the rule accords with the doctrine long recognized in and enforced by this court.

"As to whether inquiry would have led to the discovery of the fact that the mule purchased from the mortgagor was the mule covered by the mortgage was a jury question. Stickney v. Dunaway [169 Ala. 464, 53 So. 770] supra.

"And a change of the color of a horse which was correctly described in a registered mortgage, when it was executed, as a bay horse, but which, from natural or unnatural causes, became a white and sorrel spotted horse, without any appearance of bay whatever, does not defeat the rights of the mortgagee as against a person who purchased the horse after his change of color, without actual notice of the mortgage. Turpin v. Cunningham (1900) 127 N.C. 508, 37 S.E. 453, 51 L.R.A. 800, 80 Am.St.Rep. 808."

Referring to the case of Mack v. Phelan (1883) 92 N.Y. 20, where the numbers on machinery were changed, the annotator states: "Another answer to the plea of want of notice, according to the court in Mack v. Phelan (N.Y.) supra, was that the purchaser purchased property of the same general description, aside from the numbers, as that contained in the mortgage. And knowing of the mortgage and of the attempt to renew it, he was put upon inquiry, which amounted to actual notice of the mortgage, unless he pursued the inquiry diligently, and was unable thereby to ascertain the existence of the lien. The court observed that the purchaser relied alone upon the statements of the mortgagor in respect to the lien, made no inquiry of the mortgagee, and did not go to the mills, where the mortgaged property was stated in the mortgage to be, to ascertain whether there were machines there corresponding to those described in the mortgage. Under the circumstances, the court was of the opinion that it would not be held, as a matter of law, that the purchaser used due diligence in prosecuting the inquiry to ascertain whether the property purchased was covered by the mortgage."

Under these authorities the description was sufficient after the visible number of the motor had been changed. In addition to the car number, this car was identified by the mechanic who repaired it before the sale to Little, and the original engine num-

ber on the inside of the pan could still be deciphered.

On the question of the purchaser in good faith and estoppel this court has spoken in Roberts v. Lubin, 25 N.M. 658, 187 P. 551, by Mr. Justice Raynolds, as follows:

"It does not appear that defendant knew of the arrangement between plaintiff and Jones, but that he was a purchaser in good faith, acting upon the supposition that Jones owned the car in question; Jones stating to him, as he testified, that he was the owner. * * *

"The appellant contends that the principle of caveat emptor applies to this case, and that the facts brought out on the trial do not work an estoppel as to him.

"As stated by the trial judge in his oral opinion, the evidence is uncertain and hazy, but he apparently did not base his judgment upon the fact that the plaintiff failed to make out a case as to his ownership of the car, but on the fact that he, plaintiff, had, by his action, clothed Jones with the indicia of ownership and that he was estopped by this action.

"It appears that the plaintiff took no affirmative steps which misled defendant, unless it can be said that his allowing Jones to have possession of the car for repair is one. Defendant did not know about the note by which, in the controversy between Jones and the plaintiff, Jones might have claimed to be the joint owner. The trial judge laid stress on the fact that the cars were not left in plaintiff's garage, but were turned over to Jones and taken by him to his ranch; that plaintiff had no bill of sale for them; and that the note, although it was never seen nor considered by the defendant, was nevertheless a joint note and made Jones a joint owner. Can it be said that as a matter of law the delivery of possession of an automobile to Jones, under the circumstances in this case, amounted to clothing him with the indicia of ownership and estopped the plaintiff? We think not.

"In our opinion Jones was a bailee for the purpose of repairing the cars, and the defendant purchased from him at his peril. As is said in an elaborate note, at page 761, Davis v. First National Bank, 6 Ind. T. 124, 89 S.W. 1015, 25 L.R.A.(N.S.) 760:

" 'Does the owner of a chattel run the risk of losing it by parting with possession? Has the mere holder of such property such ostensible ownership that third persons may deal safely with him on the strength of the apparent title? These questions in effect are answered in the affirmative in Davis v. First National Bank, but no shadow of support is to be found in other jurisdictions for the rule adopted by the Indian Territory court.' "

And by Mr. Justice Botts in Skarda v. First Mortg. Loan Co. of Clovis et al., 28 N.M. 536, 214 P. 761, 763, as follows: "Defendants contend that plaintiff permitted Lee to so deal with these sheep as to clothe Neel with the apparent right to deal with them as his own, and is now estopped

to deny Neel's authority to execute the mortgages to defendants, under the doctrine that, where one of two innocent parties must suffer, the loss will fall upon the one whose negligence caused it. They rely on the case of Smith & Ricker v. Hill Bros. et al., 17 N.M. 415, 134 P. 243. We are furnished by defendants with rather a meager discussion of the facts or evidence upon which they base this contention, but it would seem that the most that can be said is that there was a mortgage to plaintiff on record which had been executed by Neel as well as by Lee; that, while the mortgagors promised plaintiff, at the time of the execution of the mortgage, that they would put the paint brand mentioned in the mortgage on all the sheep, plaintiff did not follow them up and see that it was done; that Lee put the sheep in charge of Neel on the latter's ranch, while he went back to his home in Kansas and prepared to move to New Mexico; and that while the sheep were so in Neel's charge he employed and paid the help necessary to care for them. As to the proposition of the mortgage being signed by Neel as well as by Lee, *it would seem that, if defendants knew of such a mortgage on these sheep, prior in time to theirs, then their mortgages could not be otherwise than inferior to plaintiff's mortgage. If they did not know of such mortgage, they were in no wise misled by it.*" (Italics mine.)

The general rule seems to be that a description that is partially untrue does not render the mortgage void if the part which is correct does not apply to other like property. The serial number shown in this mortgage is on only one Chevrolet car.

Under these authorities, as stated by the court in Bank of Commerce v. Duckworth, 27 N.M. 627, 204 P. 58, 59, "mere possession without other indicia of ownership does not give the possessor the right to convey any better title than he has." Moreover, the description in the mortgage after the change in the motor number was sufficient to give notice to purchasers from the mortgagor of what property was intended. The buyer of a car not locally known from an ex-convict has a poor case as against a bona fide owner or lien holder.

The opinion of the majority states: "Where he is in no sense responsible for the continued circulation in channels of trade or commerce of the property bearing false identification marks, his rights will be wholly unaffected by subsequent dealings in such property, no matter how good or strong the faith of him who deals in reliance upon the truth of false descriptive marks." I will not gainsay that the traffic in so-called "hot" cars has attained such proportions that, if magnitude alone is the test, it may be designated as "trade or commerce"; but is not the man who "deals in reliance upon the truth of false descriptive marks" a mythical person? There are 26,000,000 motor vehicles in this country. A very considerable proportion of them are mortgaged, and it is inconceivable to me that as a practical matter the records of these chattel mortgages, whether

 

bearing the original engine number or one substituted by the car thief, could affect the purchaser of a car unknown locally.

Is the appellant in the same status as a purchaser from the mortgagor? I think not. There is no finding that Little parted with the title. Johnson bought from Parks, who had possession, "believing that he was the owner of the car." Whether Parks was bailee or thief, Johnson, the real party in interest, acquired no better title than Parks had.

So far as appellant's title is concerned, he is in the same status as he would be in a contest with the owner of a car which, had been stolen the second time, the engine number having been changed by the first thief, and the owner's bill of sale and the officially published New Mexico Automobile License Directory showing only the old engine number in the description of the owner's car.

Conceivably, John Doe of San Juan county might have his car stolen by an ex-convict and driven in one night 500 miles towards the opposite corner of the state and sold to Richard Roe. On the trial, like the one at bar, the court might ask John Doe:

"Q. Did you have this car six hours after you recovered it before it was stolen the second time? A. I had it six months.

"Q. Why did you not restore the original engine number? A. I have no skill in that art.

"Q. Why did you not have a neighbor do the work? A. Ours is a law-abiding community and I never heard of the number on a motor being changed in that vicinity.

"The Court: Well, you should have taken this car down to the penitentiary and asked the warden to let one of the inmates skilled in this art restore the original numbers on your car.

"A. But, your Honor, it is my car, the old numbers show inside the pan, and here is the workman who repaired it and recognizes his handiwork and the serial number is intact.

"The Court: It undoubtedly *was* your car but it is yours no longer. We must protect innocent purchasers."

The main if not the sole beneficiaries of this new policy will be car thieves and their confederates. I dissent.