## DARLING & CO. v. MEDLEY.
### No. 11134.

United States Court of Appeals
Sixth Circuit.

Dec. 5, 1950.

836

Thomas E. Lipscomb, Cleveland, Ohio, Thompson, Hine & Flory, Thomas E. Lipscomb, Cleveland, Ohio, and Harold S. Walters, Chicago, Ill., on the brief, for appellant.

Chester K. Gillespie and John G. Pegg, Cleveland, Ohio, Chester K. Gillespie, and John G. Pegg, Cleveland, Ohio, on the brief, for appellee.

Before HICKS, Chief Judge, and SIMONS and McALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

From a judgment in the amount of $15,-000 rendered in favor of Henry H. Medley in an action for malicious prosecution, the defendant, Darling & Company, appeals, claiming that there was probable cause for the issuance of the warrant of arrest; that the burden of proving want of probable cause was upon appellee; and that he did not sustain the burden of such proof. Appellant further claims that the award by the jury of $10,000 compensatory damages and $5,000 punitive damages was excessive and the result of passion and prejudice.

Medley, in his petition filed in the trial court, set forth that on May 26, 1947, appellant company, through its agent and superintendent, Raymond Baumgart, falsely and maliciously, and without probable cause, filed an affidavit in the Municipal Court of Cleveland, Ohio, charging him with the offense of petit larceny, thereupon caused the issuance of a warrant for his arrest, and brought about his arrest on such charge. Medley claimed that, as a result, he was imprisoned in the police station at Cleveland, Ohio, for two days; that thereafter, he secured his release on the posting of a bond; that subsequent to his arrest, another employee of appellant company, Steve Dertz, pleaded guilty to having stolen the property in question, absolving Medley of any complicity in the theft; that after such confession by Dertz, appellant company continued to accuse Medley of the theft; that a trial was had on the charge on June 3, 1947, as a result of which Medley was acquitted and discharged, and, the prosecution thereupon ending favorably to the accused, his innocence of the offense charged against him was duly established.

The chief issue in the case is whether there was evidence that appellant brought about Medley's arrest without probable cause to believe that he was guilty of the offense charged. The effect of the jury's verdict was that there was no probable cause.

The background of the case may be summarized as follows: Appellant com-

pany is engaged in the business of rendering waste meats and fats into usable commercial materials. In addition, it deals in the curing of raw calfskins, purchasing them from such sources as packing houses, and preparing the hides by salting them, and arranging them in a stack, which is called a "pack." In the early part of April, 1947, the company found that the pack was being disturbed and that hides were being stolen. By certain markings of the hides and repeated observation of the pack, it was discovered that the thefts were being committed only on Sunday nights. It was, therefore, determined to keep a watch on the premises of the plant on the night of Sunday, May 25, 1947. Accordingly, with the object of discovering the thief, Superintendent Baumgart went to the plant about 9:30 in the evening, and upon his arrival, inspected the pack and ascertained that it had not yet been disturbed that night. Baumgart then entered a small building on the plant premises, known as the laboratory building, from the windows of which he had a view of the driveway leading into the property of the company from both front and rear streets adjacent to the plant premises. From Baumgart's vantage point, he could see a part of the area in the rear of the main building in which the hide pack was located. Floodlights erected on the plant illuminated the exterior of the buildings and the plant grounds. Some time after he had been watching through the windows of the laboratory building, Baumgart noticed the employee, Steve Dertz, working in the area behind the building. Dertz was sweeping out the trucks that were standing on the company premises and was parking them from time to time in an orderly line. Baumgart then observed Dertz turn out the floodlights at the rear of the building, the receiving room, and along the side of the building, at 10:45 P. M. One floodlight was left burning on the side of the building that lighted the driveway. He then saw Dertz going into the washroom, which was a separate building, where he remained for about an hour, coming out at 11:20 P. M., and leaving the plant along the driveway leading to the street in the front of the premises.

Sometime about midnight—the time is disputed—Medley came on duty. He was employed as a stationary fireman and had been continually in the employ of appellant company and its predecessor for 24 years at that time. His hours were from 12:00 midnight to 8:00 in the morning, but each fireman was required to spend a half hour extra time taking care of a cooling system. That evening, Medley relieved James Jones, another fireman, at midnight. His duties required him to go through and about the plant, checking and inspecting various rooms and equipment. According to Medley's testimony, which, from the circumstances, was necessarily undisputed for the most part, he entered the factory building through the side door, then went into the boiler room, afterward to a so-called expeller room, then out the side door to the back of the building, where the cooling house was located, in order to check the cooling system and to observe the pressure in certain tanks, as well as to see that the tanks weren't empty. He then went into the garage to see that a pressure water pump was shut off. Coming out of the garage, he passed the receiving room, into the driveway, and entered the door in the building that led to the upper floors. On the third floor, where grease is treated with live steam, he went to check on the steam room, found too much steam on, and turned it down. He then came downstairs, into the expeller room, and afterward into the boiler room. About 1:00 A. M., he went outdoors and up to the front part of the building to read the thermometer which was placed there, ascertained the temperature, and checked the wind, of which he made a written record. These observations were required to be made, and this record taken every hour.

Dertz and Medley were the only employees working at the plant on the night in question. It is undisputed that Medley saw and talked with Dertz during that time; but there is considerable conflict in the testimony of Baumgart and Medley as to the circumstances of Medley's encounter with Dertz that night. Appellant company claims that the circumstances of their meeting, and other evidence to be

mentioned, gave reasonable cause for the company to believe that Medley was implicated with Dertz in the subsequent theft of company property.

Baumgart, the superintendent of the company, testified that Dertz, after sweeping out and parking the trucks, and after leaving the washroom at 11:20, as has been mentioned, walked down the driveway toward the street at the front of the plant; that about a half hour later, at midnight, he saw Dertz walking along the street at the rear of the building, in the company of Medley; and that they both turned at the driveway into the plant premises and entered the side door of the main building; that a half hour later, he saw two shadows pass by a four-inch thick glass block window located at a landing between the second and third floor of the building; that the shadows were coming down the stairs from the third floor. It was on the third floor that grease containers were kept, one of which was stolen that night by Dertz. Baumgart further testified that the next thing he observed was Medley coming out the side door alone and going toward the back of the building. Forty-five minutes later, Baumgart says, he saw Dertz walking along the rear of the building alone, turning, and proceeding down the driveway out toward the street at the front of the premises; that about forty-five minutes later, Dertz came around the back of the building again, entered the driveway alongside the building, and went in through the side door. He further testified that he heard two thuds on the floor beyond the door. Later, he says that he saw Dertz drive his car from the back street into the driveway, park at the same door, go into the receiving room and remove the can of grease and the hides, which he placed in his car. Dertz then, according to Baumgart, drove the car down the driveway toward the front of the plant, stopping at the platform adjacent to the front of the building. At that point, Baumgart observed Medley coming down the steps of the platform and speaking with Dertz for about two minutes. Dertz then continued down the driveway, out the street in front of the plant, and drove away. Baumgart, some time later,

drove over to Dertz's house, where the latter's car was parked in the street. He looked inside the car, saw the container of grease, and called the police. When the police arrived, the hides were found in the trunk of the car and Dertz was arrested. At the police station, Dertz asked Baumgart, according to the latter, to "go easy" on him, to which Baumgart says he replied that it was Dertz's problem, and that he had stolen the property of the company. Baumgart declared that Dertz then said: "I wouldn't have done it if it hadn't been for Mr. Medley." This claimed conversation between Baumgart and Dertz took place at the police station before Dertz was questioned by the detectives. During his testimony on the trial below, Baumgart used a report made by himself to refresh his memory. He testified that he had made notes of his observations and conversation with Dertz in a small notebook the morning after the latter's arrest; and that he afterward wrote them out in a "later form." From this later form, he had prepared his report. He destroyed the original notes. It does not appear when he made the report which he used to refresh his memory.

Medley, on the stand, agreed with certain of Baumgart's testimony, as to seeing Dertz, and later talking with him that night, but emphatically disputes him on other vital matters. He denied that he came to the plant that night with Dertz or that they went through the buildings together. He testified that the first time he saw Dertz that night was when he went around to the back of the building to check on the cooling house; that Dertz was working out around the trucks; that later, Dertz came to the boiler room—which Medley declared was a thoroughfare for all the workers—and told Medley he had finished his work, and asked him to punch his card for him in the time clock. Later, Medley said, he saw Dertz come from the rear of the driveway up to the front platform, driving his car; that, at that time, Medley was taking thermometer readings near the platform, and that he came over and talked to Dertz for about two minutes as the latter sat in his car. Medley testified that he did not know whether, on that night, Dertz had

been on the third floor where the containers of grease were kept or whether he had been in the hide cellar which was underneath the front office. As to Dertz's statement at the time of his arrest that he would not have stolen the property if it had not been for Medley, Dertz afterward retracted this statement—if he ever made it—and declared that Medley was not implicated in the theft.

Medley was arrested on May 26, 1947, when he came to work on the night following the theft. Thereafter, he continually maintained that he was innocent of the offense of which he was accused. When the officers arrested him, Medley testified that Manager Guy walked up to them, and Medley asked Guy if he had any idea why they were arresting him. Guy's reply was: "You have been stealing from the company." The officers, with Guy and Medley, then went to the jail where, Medley testified, Guy tried to make him say that he knew something about the things that had been stolen. He stated that he told Guy that he was ignorant of the whole matter, whereupon Guy became angry and told the police officers, "Lock him up." He was afterward imprisoned at the police station and was unable to secure bond for some days. On his trial on June 3, he was acquitted, as has been heretofore mentioned.

Edward Davis, an employee of appellant company at the time of Medley's arrest and for a year afterward, testified that on May 27, a committee of employees met in Manager Guy's office to find out the circumstances of Medley's arrest. Davis testified that Baumgart was present at this meeting and told the employees that "they didn't have anything on Mr. Medley but he (Baumgart) would advise me not to interfere." On the day after Medley's arrest, James Younger, a boiler operator employed by appellant company, went down to police court to sign the bond for Medley's release from arrest, and there met Manager Guy in the courtroom. Younger testified that at that time, Guy said to him: "You are fooling with a hot potato. We caught him dead to rights." Younger testified: "I walked out of the building then. I didn't have anything more to do with him."

Manager Guy admitted that on May 27, the day after Medley's arrest and at the time Dertz pleaded guilty, Dertz accused Guy to his face of trying to get Dertz to say that Medley had helped him steal the hides. Medley testified that on his trial, on the day on which he was acquitted, Dertz told the trial judge, in Guy's presence, that Guy had tried to get him to say that Medley had helped him to steal the hides and grease.

Superintendent Baumgart swore to the warrant for Medley's arrest for the theft. He and Manager Guy had discussed the matter with Detective Wandt. Wandt was not entirely clear as to everything they told him because, he testified, the official report of his investigation was unavailable at the time of the trial. He said it "can't be located;" and he volunteered the statement that he lacked this report to refresh his memory. Wandt testified, however, that he talked with Dertz after his arrest and that Dertz had "implicated (Medley) as to where the material was, that he had taken out of the plant. He said he showed him where the stuff was; that he had no idea of it because he was only there a short time and that he was not known, that is to what was going on, and he said that there was a lot of other thefts going on by different drivers and that they were selling it back to the company again." He further testified that Dertz had told him that Medley showed him where the various materials were in the plant. The testimony of appellant company's manager, however, discloses that Dertz had been employed by the company for five months before his arrest and for four months before the company noticed the thefts. He had been working Sunday nights during the time that Medley was working. The night of his arrest, however, was the first Sunday night that Dertz and Medley were the only workmen at the plant. The thefts had been going on during the prior four or five weeks—always on Sunday nights. The foregoing evidence might have been considered by a jury as bearing upon Wandt's memory or credibility as to the claimed statements made by Dertz that he was only there a short time and could not have known where the

hides were stored without Medley's help. For the jury could reasonably infer from this evidence that Dertz had been stealing the hides on the previous Sunday nights; that he had no need to be taken around the building by Medley in order to be shown where the hides were stored on the night on which he was arrested; and that he had not made the claimed statement to Wandt. Dertz himself was not produced upon the trial as a witness.

Wandt, Guy, and Baumgart afterward called on the prosecutor with regard to a warrant. The prosecutor testified that as Wandt described the circumstances of the case, he turned a number of times to Guy and Baumgart for verification of the facts he was relating. Among other statements Wandt made to the prosecutor was that he had questioned Dertz, who had admitted taking the skins, "and he implicated or he stated that Mr. Medley asked him to make it possible to carry away those skins." In issuing the warrant, the prosecutor, in stating the grounds to justify his action, testified: "Added to that (the alleged statement of Dertz) was the information furnished to me by Mr. Guy and Mr. Baumgart, the fact that they observed the arrested defendant conversing with the other person, that the other person admitted the known thief into the building, that they observed the other person, as he admitted them (sic) into the building and they observed him again as the known thief was leaving the place." This was not at all what Baumgart and Guy claimed. No other evidence in the case shows Guy to have been at the plant the night of the arrest and no one made such a claim. Moreover, no one testified in that particular way that Dertz had been seen conversing with Medley and that thereafter Medley had admitted him into the building. If the facts had been represented to the prosecutor as he testified, it would have been equivalent to a statement by Guy and Baumgart that they saw Medley letting Dertz into the plant, and participating and aiding in the theft. This was not claimed.

There is no evidence that Medley's duties included guarding the plant against the intrusion of others. As far as appears from the evidence, Dertz could enter the building without Medley's help. The foregoing incongruities could be considered by the jury in appraising the memory either of the prosecutor or of appellant's agents, and the credibility to be given their testimony with reference to the circumstances surrounding the issuance of the warrant.

Up to the time of his arrest, Medley had been a trusted employee of the company and its predecessor for twenty-four years. Among other marks of confidence keys to the stockrooms, where all tools, spare parts, light bulbs, and similar material were kept by the company, were confided to him. At one time, when the company withdrew its money from the bank and placed it in the office safe, it informed Medley of the fact, and entrusted to him the guard over it at night. Furthermore, the manager of the company gave him the keys to his home at one time for three days during his absence from the city. That was so Medley could take care of the heating of the house, and while, in itself, it was not of great importance, it indicated that Medley was a trusted workman.

When Baumgart and Guy, in the company of Wandt, called on the prosecutor, Baumgart did not tell the prosecutor that Medley had been a trusted employee. Guy testified that at first he could not recall that he told the prosecutor of this fact, but that he would say "yes." The prosecutor testified that Guy did not tell him anything about the former service of Medley as a trusted employee or indicate that fact in any way. In response to a question as to whether Guy indicated anything about the service of Medley "Other than that the man had been a trusted and faithful employee of the company" the prosecutor answered, "No, none of those facts were reported to me." As a matter of fact, the prosecutor at no time testified that Guy had indicated that Medley had been a trusted employee; nor was he told anything about the nature of Medley's work. He did, however, say that in the general conversation, there was mention that Medley had been with the company for some time, but he couldn't recall whether one year or two years, or a short period. His impression was that

Medley was there "one, two, maybe even three years, not even that long."

The evidence, then, may be summarized: Medley, a trusted employee of twenty-four years' service, of good reputation and record, was arrested upon a warrant issued on the affidavit of the company superintendent. The affidavit was largely based on the alleged statement of the confessed thief to the effect that he would not have stolen the property if it had not been for Medley. The man who admitted his own guilt was never asked what he meant by this statement, nor was the matter pursued further. Wandt's testimony that Dertz implicated Medley as to where the items were located likewise indicated that Dertz, if he did "implicate" Medley as above stated, was not questioned further about the matter. With this rather skimpy accusation claimed to have been made by an admittedly known thief, Medley himself, in spite of his long period of faithful service to the company, was never asked any questions before his arrest nor given any chance to deny, contradict, or tell his side of the story. The jury may well have considered that, before an affidavit was made by the superintendent of the company, and a warrant issued against a man of Medley's long service as a trusted employee on the statement of a known thief, probable cause to believe in his guilt called for more of an investigation as to how Medley was implicated with Dertz, or that Medley should have been asked about the matter; or that he was entitled to be confronted with Dertz, if Dertz had made the accusation against him; or that there was no justification under the circumstances, to arrest him as a thief, without hearing what he had to say in his own defense. For the jury may have felt that the accusation made by a confessed thief, who has just been arrested, is usually accepted with some reserve. The jury may also have considered Dertz's accusation, made against Guy, that the latter had unsuccessfully tried to get him to say that Medley had helped him in the theft after Dertz had allegedly withdrawn the statement of Medley's implication in the theft. Moreover, it appears that after Dertz had withdrawn the statement, the officials of the company continued the prosecution of Medley up to the time he was acquitted. Furthermore, the jury could have believed Medley's testimony, rather than that of Baumgart; and it was not bound to accept Wandt's testimony as conclusive for, under the circumstances of this case, the jury was, properly, the sole judge of the weight and credibility to be given to such evidence. Moreover, it might have considered that the officials of appellant company, in not informing the prosecutor of Medley's long and satisfactory service, good record, and the fact that he was accused by a known thief, had not made a full and fair presentation to him of the facts within its knowledge or which, by reasonable diligence, it could have ascertained, and which it had reasonable cause for believing could be proved as to the innocence or guilt of Medley.

The district court instructed the jury that Medley, in order to recover, must prove, by the preponderance of the evidence, that the agent of the company acted without reasonable or probable cause in swearing to the affidavit against him and was actuated by malice in so doing, the responsibility for such conduct, resting upon the company. The jury was told, however, that the mere belief that there was reasonable cause for prosecuting Medley was not sufficient to show probable cause, but that there must have been an honest and sincere belief and must have been based upon reasonable grounds. Malice, in a legal sense, was defined by the court as any wrongful act, done purposely and without a reasonable or lawful excuse, to the injury of another. The jury was instructed that the prosecution of a criminal charge which was brought under such circumstances was malicious, and that malice may be shown by the facts and circumstances of the case. The court further charged: "The want of probable cause is the gist of this action, and if want of probable cause be shown the legal inference may be drawn that the proceedings were actuated by malice. * * If you find that there were reasonable grounds of suspicion, supported by circumstances sufficiently strong in themselves to warrant an ordinarily cautious man in

believing that the plaintiff was guilty of the offense with which he was charged, then the defendant acted with probable cause in swearing to the affidavit against the plaintiff." These instructions properly presented the question of probable cause and malice to the jury for its consideration.

Appellant contends that the trial court erred in excluding certain proffered evidence with respect to its discharge of Medley from employment. The company claims he was discharged, not because of alleged complicity in the theft, but because, upon the request of Dertz, he had punched the latter's time card for him. Baumgart testified that the practice of an employee's punching the time card for another was against company policy; and that, after Medley's acquittal, the company gave the union the reason why it discharged Medley. In attempting to show what reason was given to the union, counsel for appellant on the trial stated: "The purpose is, I am trying to show that Mr. Medley was discharged because of that punching of the card." Upon objection to this statement by opposing counsel, the trial court advised the jury to disregard the remark and allowed Baumgart to testify that, as superintendent, he gave the union a reason for Medley's discharge during the course of a meeting with the union representatives. When counsel attempted to have the witness testify what the reason was which was given to the union, the trial court excluded further examination along this line on the ground that it invaded collateral issues. Appellant now contends that if Baumgart had been permitted to testify on the point, it would have established that the officers of the union, who were also employees of the company, recognized Medley's act in punching Dertz's time card as being a serious breach of the company's rules and justifiable cause for his discharge; and that if the company had sanctioned the practice of one employee's punching the time card of another before the latter's tour of duty had ended, the officers of the union would not have accepted the reason given by Baumgart for Medley's discharge. On this point, Medley had testified, on cross-examination, that during the war, it was so difficult to get men to work at appellant company's plant that "they gave in a whole lot to them;" that on Sundays and holidays, when there was meat waste and fats left over from Saturday or the day before, it would spoil if it were not worked up on Sunday; that in order to keep it from spoiling, which would result in complaints from the neighborhood, men were induced to "work up the stuff" and that such workers were told "to come out and clean it up * * * and get a day's work." Medley further testified that he had often punched cards for other workmen when the foreman left them with such instructions, and that he felt it was not against company rules. Davis, another employee, testified that in the meeting with Baumgart, the employees discussed with him the fact that the cards had been punched by other employees before the time that Medley had done so; that it was something "off the record that the higher-ups and everybody else knew about it;" and that after Medley's arrest, a notice was posted for the first time that every man must punch his own card.

■ Without further discussion of the matter, it is clear that a continuation of the examination of Baumgart on this point, as sought by appellant and excluded by the court, would have opened an inquiry into a collateral issue that was properly avoided by the court's ruling; and, from the foregoing outline of the contradictory testimony on the subject, and the proffer and remarks of counsel, it is evident that no prejudice resulted, and certainly, no reversible error.

■ With respect to appellant's complaint that the verdict was excessive, Medley, at the time of his arrest, was married and the father of eight children. He had a very good reputation in his community and was a man of prominence in his church. He was known to have rendered many years of service to the company that employed him. His record with society and with his employer was, and always had been, clean. Medley lost his job with the company; and although appellant claims his discharge resulted from his violation of rules, in punching time cards for other em-

ployees, the jury could have found that this was the result of its feeling against him, growing out of the arrest. He had been the choir leader in his church before the charge made against him. After his arrest, he was removed from the choir and was excluded from it even after his acquittal. In the words of one of the witnesses, the officers of the church "turned him down." When he was released from jail, as one of his acquaintances remarked, the neighbors would say of him, "He just got out of jail; they had him locked up for stealing." Prior to his arrest, he earned $5,800 per year with appellant company; he now earns $3,400 in other employment. His world was not a large world. It was a small one, made up of his family, his fellow workmen, his employers, his neighbors, and his church. But in his small world, the charges made against him that he was a thief, brought disaster. His good name was filched. He fell into disgrace, and underwent shame and humiliation; and he lost his job. Under the circumstances of this case, it cannot be held that the verdict of the jury was excessive.

We find no error in the trial court's charge to the jury, or in its rulings excluding evidence offered by appellant and denying appellant's motion for a new trial, or for a *remittitur*.

In accordance with the foregoing, the judgment of the district court is affirmed.