**Louis M. RAY, Plaintiff,**

v.

**CITY BANK & TRUST COMPANY OF NATCHEZ, MISSISSIPPI, et al., Defendants.**

**Civ. No. 71–210.**

United States District Court,
S. D. Ohio, E. D.

May 9, 1973.

Gordon K. Bolon, Applegate, Bolon & Alban, Columbus, Ohio, for plaintiff.

Edgar A. Strause, Vorys, Sater, Seymour & Pease, Columbus, Ohio, for City Bank.

Bernard V. Fultz, Pomeroy, Ohio, for Sheriff Robert C. Hartenbach.

CARL B. RUBIN, District Judge.

## A. STATEMENT OF THE CASE

This diversity action was instituted by the plaintiff, Louis M. Ray, a Louisiana resident, against The City Bank and Trust Company of Natchez, Mississippi, and Robert C. Hartenbach, Sheriff of Meigs County, Ohio. The complaint sounds in tort and alleges the wrongful attachment of plaintiff's oil drilling equipment. The jurisdiction of this Court is invoked under Title 28, United States Code Annotated, Section 1332. After non-jury trial conducted on December 14 and 15, 1972, and upon the pleadings, briefs and exhibits submitted by the parties, the Court, pursuant to Rule 52(a), Fed.R.Civ.P., enters the following findings of fact and memorandum opinion of law.

## B. FINDINGS OF FACT

### 1.

### The Rig

■ The central piece of equipment involved in this matter is a mobile oil well drilling rig, Serial Number 5616. Plaintiff's first allegation is that the defendant bank did not have a security interest in this particular rig, and accordingly had no authority to attach it. In support of this proposition, plaintiff offered evidence that the Universal Supply Company, which sold him the rig and from whom the bank obtained its security interest, had two or three other rigs similar in make and description. We do not think that such evidence is alone sufficient to carry plaintiff's burden of proof. What is more, the defendant introduced substantial documentary evidence of its interest in the rig in question.

While the equipment is described in different terms in different documents, it is agreed that it was a Wilson Mogul Model 42 self-propelled drilling rig, equipped with a double drum draw works and a 90 foot Wilson derrick that the plaintiff owned and maintained in Ohio in 1971. Oil drilling equipment consists, however, of replaceable parts and appurtenances. From 1965 to 1970, the equipment was, at various times, mounted on different carriers and powered by different engines.

Prior to November of 1965, the rig in question, serial numbered 5616, was owned by one R. H. Read, Jr. On November 23, 1965, Mr. Read gave a security interest in the equipment to the C. I.T. Corporation to secure an indebtedness of $35,812.00. At that time the equipment was described as follows:

"Wilson Mogul double drum unit Model 42, Serial 5616, together with 90 foot derrick mounted on W. C. White four-axle truck carrier Model WC2464, Serial 486275, powered by White propane engine Model 39A."
(Exhibits 0–1, 0–2, 0–3, 0–4)

At some time between November of 1965 and January of 1968, the mounting was changed from a White carrier to a Champion carrier.

On January 23, 1968, an insurance policy issued by the United States Fire Insurance Company described the following equipment:

One (1) Wilson 42 Mogul double drum unit with 90 foot derrick and 671–N diesel engine mounted on and including International chassis C–100, National Pump No. C102330, and 1091 International diesel engine UPE2320.

This insurance policy is identified as Defendants' Exhibit X. It consists of fifteen separate sheets of paper, including correspondence, notations and endorsements of policies. Included in the papers of Exhibit X is a second description. This description is:

Wilson 42 Mogul double drum with 90 foot Wilson derrick and 671–N diesel engine, self-propelled tandem front end, tandem rear, 10:00 x 20 tires, rear wheels, *hydraulic rasing* [sic] *rams*. (emphasis added)

In tracing the history of this equipment, Exhibit X contains two items of substantial significance. The phrase, "hydraulic rasing rams," is used in future descriptions. The Court notes that "hydraulic rasing rams" is a misspelled reference to hydraulic *raising* rams, the equipment used in a mobile drilling rig to elevate the derrick to a vertical position.

Of further significance in Exhibit X is a photograph. While the policy at one point describes an International chassis and previously the equipment had been carried on a White chassis, the picture is of a Champion chassis and is identical to the equipment pictured in plaintiff's Exhibit 13. Exhibit 13 is a photograph of the plaintiff's rig, numbered 5616, at approximately the time of its attachment.

On September 13, 1968, the Universal Supply Company executed a security

agreement[1] to City Bank and Trust Company in the following equipment:

Wilson 42 Mogul double drum with 90 ft. Wilson derrick and 671–N diesel engine, self-propelled, tandem front end, tandem rear, 10:00 x 20 tires, rear wheels, *hydraulic rasing rams* (emphasis added).

It is this security agreement upon which the defendant relies in this action.

It can be asserted that the equipment owned by R. H. Read, Jr., identified with Serial No. 5616, is not the same as the equipment upon which City Bank and Trust Company obtained a security agreement. The evidence, however, of Exhibit X with the picture of the equipment acquired by plaintiff and with the identical misspelled word in the description that is subsequently used in all security transactions by defendant, is such that the Court finds as a matter of fact that the Wilson 42 Mogul drilling rig acquired by plaintiff was covered by defendant's security agreement.

#### 2.

### The Security Transaction

The transaction between Universal Supply Company, plaintiff's predecessor in title, and defendant City Bank and Trust Company is evidenced by Defendant's Exhibits B, C, D, E, and F. Defendant's Exhibit B is a security agreement for the sum of $91,783.77. It covers two separate drilling rigs, a Wilson 42 Mogul and an H30 Ideco self-propelled, plus collateral equipment for each rig. The description of the Wilson is identical to that contained in Exhibit X, to-wit: One Wilson 42 Mogul double drum with 90 foot Wilson derrick and 671–N diesel engine, self-propelled tandem front end, tandem rear, 10:00 x 20 tires, rear wheels, hydraulic rasing ram.

In the preparation of the financing statement, however, a significant omis-sion is made in the description. In Exhibit C, which was filed in Adams County, Mississippi, Exhibit D, which was filed with the Secretary of State of Mississippi, Exhibit E, apparently filed with the Secretary of State of Austin, Texas, and Exhibit F, filed with the Secretary of State of Ohio, the identical error in description occurs. In each of these exhibits the equipment is described as follows:

One Wilson 42 Mogul double drum with 90 foot Wilson derrick and 671–N diesel engine.

This does not describe a self-propelled drilling rig. It describes instead, according to the custom of the industry, a stationary piece of equipment with a diesel engine to operate it. (R. 225 & 228)

A Wilson 42 double drum drilling rig with a 90 foot Wilson derrick and a 671–N diesel engine is a standard piece of equipment for oil well drilling. There are many such rigs in operation. Under the circumstances of this case, and for reasons which will be discussed more fully, we find that the description in the defendant's financing statement, containing as it did, no reference to self-propelling equipment, was insufficient to place the plaintiff on notice that the equipment he had purchased was covered by a security agreement.

#### 3.

### The Attachment

Between December of 1968 and February of 1970, ownership of the equipment in question changed hands several times. On December 10, 1969, Universal Supply sold the rig and related equipment to the Ace Investments, Ltd. (whose president is the plaintiff), in consideration of which plaintiff paid Universal $40,000.-00 in cash and released G. L. Fife, its president, from an antecedent personal obligation owing to him (Plaintiff's Ex-

---

1. At the time the security agreement was executed September 13, 1968, defendant City Bank and Trust Company did not have a first lien. The C.I.T. security interest referred to in Exhibits 0–1, 0–2, 0–3 and 0–4 was not cancelled until December 5, 1968 (Exhibit 0–5).

hibit 1; R. 87). On February 22, 1970, plaintiff personally purchased the equipment from Ace Investments and thereafter transported it to Ohio (Plaintiff's Exhibit 2). At no time prior to this sale was plaintiff aware that the equipment was subject to the City Bank's security interest, which had attached on September 13, 1968 (Defendants' Exhibit B).[2]

At some point prior to March 24, 1970, G. L. Fife, Jr. defaulted on his loan with the City Bank. The collateral for this loan was the Wilson rig and the separate Ideco rig, which had already been attached and sold. Feeling itself no longer secure, the bank, acting through its attorney in Ohio, initiated attachment proceedings against the Wilson rig in Meigs County. On March 24, 1970, the Sheriff of Meigs County, Ohio, was ordered to attach certain personal property, described as follows:

1–Wilson 42 Mogal Double Drum with 90' Wilson Derrick and 671–N Diesel Engine, self propelled Tandem front end, Tandem rear 10:00 x 20 tires rear wheels, Hydraulic rasing rams; 1500' 1" Drill Line; 3 Sheive shorty Brewster block & hook; 1 set hydraulic tongs (Hillman & Kelly); C–100 National Pump, S/N C–102330; J–2 Drilling Head; 2⅜ Elevators; 2⅞ Elevators; 2⅞ Slips; 1091 Int. Engine Deisel, S/N UPE2320; H–30 Ideco Self-Propelled W/6110 GMC Engine W/300, 000#; Ideco Derrick & Trailer mounted sub-structor Serial #114; 7¼ x 14 Gardner Denver Pump, Serial #108705; 1 set 671 G.M.'s Serial #5152825–R; 1 Three Sheive McKissit Block & Hook; 1 Type F Emsco Swivel; 1 12" Bewruster Rotary Powered & Waukesha Engine & Transmission; 1 45' Kelley Hose; 1 set Hy. Tongs; 1 7½ x 12 Steel Tool House; 1 10 K.W. Light Plant; 1 Dowell Triplex Hi-Pressure Pump s/220 Cummings Deisel Engine w/5-speed transmission and 3-speed transmission unitized w/chains & sprockets, bearing serial Nos. 74556 (pump) and 4000100 (engine) *together with all equipment, parts, accessories, attachments and replacements thereof and additions thereto.* (emphasis added)

The order of attachment was properly issued within the terms of Ohio Revised Code §§ 2715.05, 2715.06 and 2715.07. It describes, however, the Wilson rig in accordance with the security agreement (Exhibit B) and not in accordance with the financing statement filed with the Secretary of State of Ohio (Exhibit F). No satisfactory explanation was given for the attempted attachment of the Ideco rig. At the time the defendant knew that the Ideco rig was neither in Ohio nor subject to the attachment powers of the defendant. The Ideco rig had been attached pursuant to a security agreement superior to that of the bank and sold (R. 187, 189). However, the bank at no time imparted this knowledge either to the Court of Common Pleas or the attaching sheriff. By neglecting so to do, the bank made it possible for the Sheriff to attach property of the plaintiff which had never been subject to the security agreement but which was similar to equipment appurtenant to the Ideco rig.[3]

The "catch-all" phrase at the end of the order, "all equipment, parts, accessories, attachments and replacements thereof and additions thereto," could only be intended to subject every piece of equipment on plaintiff's lot to the order of attachment and plaintiff was so instructed (R. 41). The Sheriff attached but left where he found it, all the equipment on plaintiff's lot, including both the Wilson rig and equipment

---

2. The contrary testimony of the Bank's president, even if admissible, is not credible to this Court. See R. 344.

3. An examination of the list of items attached (Exhibit A) indicates at least three items belonging to plaintiff that were similar to those described in the Ideco portion of the security agreement: 7½ x 12 Steel Tool House, Waukesha Engine, 16 KW GE Sperry Light plant.

which was similar to that described by the Ideco rig but which was, in fact, the personal property of the plaintiff.

### 4.

### Events after Attachment

On March 27, 1970, one day after the attachment, plaintiff notified the defendant bank that the attachment constituted "an erroneous and illegal seizure of personal property" and requested an immediate release (Plaintiff's Exhibit 4). He phoned the Sheriff's office and was instructed that all property on the lot had been constructively seized (R. 41 & 135). He made immediate inquiries with various courts in Mississippi, Louisiana and Texas in a further attempt to determine the existence or non-existence of a lien on his property (Plaintiff's Exhibit 6). He notified the Meigs County Court of Common Pleas of his position by letter and sent a copy of said letter to the bank (Plaintiff's Exhibit 11). On April 3 he again wrote the bank (Plaintiff's Exhibit 16). No apparent inquiry as to plaintiff's claim was ever made by the bank, nor any further action taken with regard to the attached property. It was left unattended, in an open field, subject to pilferage and vandalism and damage by the elements, until May 10, 1971, when the action in Meigs County was dismissed and the attachment released (Exhibit G).

After the return of the equipment, significantly damaged, to plaintiff in May of 1971, it was sold, upon the submission of bids, for $6,000.00.

### 5.

### Value of the Machinery

■ There is a substantial conflict as to the value of the Wilson rig at the time of attachment. Other than the Champion carrier, the Wilson rig, Serial 5616, was apparently fourteen years old (R. 234). It was, however, in serviceable condition at the time of such seizure (R. 288, 326). Plaintiff's experts testified the rig to be worth $75,000.00 (R. 231) and from $50,000.00 to $100,000.00

(R. 259). Its past history indicated a security agreement in 1965 against such property in the sum of $35,812.00 (Exhibit O), a lien to Mercantile Finance in 1968 in the sum of $45,980.00 (Exhibit M), a chattel mortgage against it in 1968 in the sum of $33,582.00 (Exhibit K). The property was insured against loss in 1968 in the sum of $43,000.00 (Exhibit X). While none of these values represent a sale price, they do tend to add validity to the lowest figure mentioned by plaintiff's experts rather than the highest. Accordingly, the Court finds that the reasonable market value of the machinery at the time of seizure was $50,000.00.

■ That there was loss and damage to other equipment of the plaintiff has been established. The value of such loss and damage has not, however, been fixed with particularity. Some of the equipment claimed by plaintiff had been removed by third persons before or around the time of the attachment (R. 328), a substantial amount was rented and not owned (R. 266) and some of the balance has been described as "poor" and "obsolete," (R. 326). There was, however, general testimony that $10,000.00 worth of hand tools are required for the drilling of a five thousand foot well (R. 230). In view of this and other similar testimony, the Court finds that the plaintiff incurred losses resulting from the damage to his personal property and awards nominal damages to him in the amount of $100.00.

### 6.

### Loss of Business

■ Plaintiff has failed to establish by a preponderance of the evidence any loss of business or profits therefrom by reason of the attachment.

### C. MEMORANDUM OPINION OF LAW

### I

The Court has jurisdiction of this action under 28 U.S.C.A. § 1332.

**638**

In attachment situations such as the present one, where a non-resident defendant is involved, a statutory bond or undertaking is not required under Ohio law. See O.R.C. § 2715.04. A suit for wrongful attachment when not based upon the creditor's undertaking, is premised upon common law notions of malicious prosecution or abuse of process. Fortman v. Rottier, 8 Ohio St. 548 (1858); Crow v. Sims, 88 Ohio St. 214, 102 N.E. 741 (1913); Ault v. Jones, 7 O.N.P. 669. In order to succeed under such a theory, it is necessary to prove both malice, either express or implied, and lack of probable cause, on the part of the attaching creditor. Zigler v. Russell, 2 O.Dec. (Rep.) 518 (1857); Fortman v. Rottier, *supra*; Crow v. Sims, *supra*; Pergola v. Penn R. Co., 311 F.2d 837 (C.A. 6 1963); Smith v. Transamerican Freight Lines, 72 Ohio App. 239, 51 N.E.2d 208, 27 O.O. 101 (1943); see generally, 6 Am.Jur.2d §§ 596 et seq. Attachment & Garnishment.

Legal or implied malice is a state of mind, which may be inferred from the intentional doing of a wrongful act. Smith v. Transamerican Freight Lines, *supra*; Darling & Co. v. Medley, 185 F.2d 835 (C.A. 6 1950); Skarbinski v. Henry H. Krause Co., 378 F.2d 656 (C.A. 6 1967); 35 O.Jur.2d § 22, Malicious Prosecution. Legal malice need not connote actual ill will or evil intent. It instead may be evidenced by a wanton or reckless refusal to make reasonable investigation with regard to the propriety of a prosecution, or by the refusal to terminate such prosecution upon notice that it is wrongful. See Curls v. Lenox Garage Co., 68 Ohio App. 285, 40 N.E.2d 213, 22 O.O. 453 (1941); White v. Tucker, 16 Ohio St. 468 (1866); Rogers v. Barbera, 170 Ohio St. 241, 164 N.E.2d 162 (1960).

There is probable cause for the institution of a civil action when facts and circumstances exist which would warrant a cautious man in the belief that his action, and the means taken in presenting such action, are legally just and proper. See 35 O.Jur.2d § 25, citing cases. In determining whether a person acts without probable cause when he institutes an action, it is proper to take into consideration the reasonableness of his belief in light of the facts and circumstances of which he was, or should, upon reasonable inquiry, have been, aware. See, e. g., Sessoms v. Union Savings & Trust Co., 342 F.2d 751 (C.A. 6 1965). In Ohio, lack of probable cause may be inferred when a person who initiates the action voluntarily and without satisfactory explanation, abandons it. See, Funk v. Amor, 2 O.C.D. 541, 4 Cir.Ct.R. 271 (1889); Dugan v. O'Neil, 5 O.Dec. (Rep.) 459; Fortman v. Rottier, *supra*, 8 Ohio St. at 553.

We conclude that there is ample evidence in this case to support plaintiff's action for wrongful attachment. Implied malice on the part of the defendant bank is demonstrated by its refusal to take any action to release property clearly belonging to the plaintiff, by its willful failure, after notice, to amend an attachment order which was demonstrably overbroad. Want of probable cause is evidenced by the bank's inexplicable abandonment, for over a year until its discharge, of the attached property—an act inconsistent with the honest belief that its seizure was proper in the first instance. See Fortman v. Rottier, *supra*; Funk v. Amor, *supra*; Dugan v. O'Neil, *supra*; Edgington v. Glassmeyer, Ohio App., 11 O.O.2d 439, 443, 168 N.E.2d 425 (1959). See also, 54 C.J.S. Malicious Prosecution § 55 passim. The bank's actions and inactions in this case display a wanton and callous disregard of the rights of the plaintiff; it is proper that he should have a remedy at law.

II

We have found, as a matter of fact, that the defendant bank obtained a security interest in the Wilson rig in 1968. The question remains: what were the relative rights of the plaintiff and the bank with regard to the Wilson rig at the time of attachment, in 1970? For

reasons which follow, we hold that the financing statements filed in various states were insufficient to place the plaintiff on notice of defendant's security interest, that the bank's interest was therefore never perfected, and that the plaintiff's interest in the rig was superior to that of the defendant.

 Our determination of these questions is governed by the law of Mississippi, that being the principal place of business of the debtor, G. L. Fife. See O.R.C. § 1309.03(B) and Comment 3; see also 1309.07(B). In the absence, however, of any relevant case law arising out of Mississippi and because that jurisdiction has adopted the Uniform Commercial Code, we look to the Code, and the interstitial case law of other jurisdictions, to guide our inquiry.

 At the outset, we dispose of plaintiff's contention that he was a "buyer in [the] ordinary course of business" whose interest in the rig, by statute and at all times, was superior to that of the defendant. Mississippi Code Annotated (M.C.A.) § 41A:9:307(1). The defendant has established that the plaintiff's purchase of the Wilson rig was in partial satisfaction of a prior personal debt. See Findings of Fact, *supra*, at p. 5. As such, plaintiff was not a "buyer in the ordinary course." Section 1–201(9) of the Code expressly so provides.[3]

Determination of the sufficiency of the financing statements is governed by sections 9–402 and 9–110 of the Uniform Commercial Code. Insofar as it is relevant, section 9–402 provides:

(1) A financing statement is sufficient if it is signed by the debtor and the secured party, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address of the debtor and contains a statement indicating the types, or describing the items, of collateral.

\* \* \* \* \* \*

(5) A financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading.

U.C.C., Section 9–10, provides more generally:

For the purposes of this Article any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described.

 The net effect of these two sections, taken together, is to continue the system of "notice" filing which was successful under the Uniform Trust Receipts Act. As a general rule, a financing description is sufficient if it describes the collateral in such a manner that reasonable further inquiry will disclose the complete state of affairs. See Official Comment 2, U.C.C. § 9–402. Thus, fanatical exactitude of description is not required; but significant omissions or material disparities between the financing statement and the security agreement, if they frustrate or forestall further inquiry, may, in certain circumstances, prevent perfection of the lien. See, Plemens v. Didde-Glaser, Inc., 244 Md. 556, 224 A.2d 464 (1966); In re King-Porter Co., 446 F.2d 722 (C.A.5 1971); Bank of North America v. Bank of Nutley, 94 N.J.Super. 220, 227 A.2d 535 (1967); Manning v. Miller, 206 S. W.2d 165 (Tex.Civ.App.1947); Shephard v. Van Doren, 40 N.M. 380, 60 P.2d 635 (1936); Security First National Bank

---

3. "(9) 'Buyer in ordinary course of business' means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker. 'Buying' may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a pre-existing contract for sale *but does not include a transfer* in bulk or as security for or *in total or partial satisfaction of a money debt.*" (Emphasis added)

v. Haden, 211 Cal.App.2d 459, 27 Cal. Rptr. 282, 2 A.L.R.3d 832 (1962). As one commentator has noted:

When there is a conflict between the financing statement on file and the security agreement as to the property involved, the latter prevails for the reason that no security interest can exist in the absence of a security agreement, and therefore a financing statement which goes beyond the scope of the agreement has no effect to that extent.

The Code expressly states the criterion for the sufficiency of the description of the collateral but does not make any express provision as to the effect of a conflict between the description of the collateral in the security agreement and its description in the financing statement.

If the conflict is not seriously misleading, the security agreement is effective to create and the financing statement is effective to perfect the security interest in the collateral which is identified by the description. If the conflict is so significant that a reasonable man would not recognize the two descriptions as referring to the same subject matter or would not be put on inquiry that perhaps there is some error and in fact the two descriptions do refer to the same collat-

eral, it seems that the conclusion must be reached that the security agreement gives rise to a security interest in the property which fits its description. *This interest, however, is not perfected by the filing of a financing statement in which the description is so inconsistent with a true description of the collateral that a reasonable man would not be put on inquiry as to the identity of the collateral.* (emphasis added) 4 Anderson, Uniform Commercial Code (2d ed.), § 9–110:17 at pp. 124–125.

The question in this case is whether the omission of the words "self-propelled Tandem front end, Tandem rear" from the financing statements filed in Mississippi and other states was such as to mislead a third party in the course of a title search and reasonably forestall further inquiry. Put otherwise, could the plaintiff, under the circumstances of this case, reasonably conclude that the phrase "Wilson 42 Mogul Double Drum with 90 foot Wilson Derrick and 671–N Diesel Engine," without the words, "self-propelled Tandem Front end," described a stationary rig and not his own. Although there is conflicting testimony in the record on this question, we resolve it in plaintiff's favor.[4]

█ It must be kept in mind that the plaintiff in this case was a third

---

4. For example, Mr. Howard Broom, an expert in drilling technology, testified as follows:

Q Now, going back to having seen that equipment or that unit, in your opinion, sir, does the phrase one Wilson 42 Mogul Double Drum with 90-foot derrick and 671–N diesel engine reasonably identify that unit?

A No, and if I might add, I will say why.

Q You may explain.

A Because we get lists of used equipment regularly from dealers across the country, and the equipment is always described if it is just a draw works or just a derrick or what have you. If it is mounted, it will say so. If it isn't mount-it says nothing about being on wheels or what have you. If I saw this description on a used equipment sheet, I would as-

sume that it is a skid sitting there that could be put on some sort of carrier or trailer or what have you.

Q Now, looking at Defendants' Exhibit C again, does that describe a mounted rig later on in the description?

A You mean the additional equipment here such as Ideco self-propelled?

Q Yes.

A Yes. Self-propelled tells the story. It moves under its own power.

(R. 227–228)

Although there is contrary testimony in the record from defendant's expert, Mr. James Morgan, even he admitted on cross-examination that the description in the financing statement was a "lean description." (R. 217). We conclude that it was not sufficient to describe the rig in question.

party, a stranger, to the underlying transaction. As a third party, he was entitled to a greater measure of specificity and accuracy in description than the debtor himself. See, generally, 10 Am. Jur. 751, Chattel Mortgages § 54; Annot., Chattel Mortgage—Description, 32 A.L.R.2d 920, 929. Here, in addition to a misleading omission in the financing statement and a lack of serial identification, the property described was common in the industry, interchangeable in parts, and similar in make and design to other equipment, owned at various locations, in various states, by the debtor. Under such circumstances, a title search becomes a frustrating business indeed; and even the most diligent inquiry may lead to irreconcilable confusion. The plaintiff twice made inquiries with regard to prior mortgage on his rig, on each occasion with the assistance of counsel. In each instance, his attorney advised him that the rig in question was free from prior liens. While we may agree with the Fifth Circuit that "the Code helps only those who help themselves," In Re King-Porter Co., *supra*, 446 F.2d at 729, it does not require third parties to be prophets.

▊ For these reasons, the Court holds that the financing statement did not sufficiently describe the drilling rig so as to reasonably notify the plaintiff of the existence of a prior lien. Accordingly, the bank's interest in the rig was not perfected as required by statute and any subsequent attachment was in violation of plaintiff's superior rights under the Code. See Uniform Commercial Code, Sections 9–301(1)(c); 9–302(1) (c); Strevell-Paterson Finance Co. v. May, 77 N.M. 331, 422 P.2d 366 (1967); Re Ferro Contracting Co., 380 F.2d 116 (C.A.3 1967), cert. den., Barbato v. Livingston Nat. Bank, 389 U.S. 974, 88 S.Ct. 475, 19 L.Ed.2d 466 (1967). See, generally, Van Huss v. University Handbag Co., Inc., 241 So.2d 344 (Sup.Ct.Miss.1970).

III

During the period of the wrongful attachment, plaintiff's rig and the other equipment, both purchased from Universal Supply and independently by the plaintiff, were significantly damaged. We hold that such damage was the proximate result of the primary wrongful conduct of the attaching creditor. We further hold that Sheriff Hartenbach was not negligent in the care of the machinery.

In Merchants Fire Insurance Co. v. Mickler, 14 O.L.Abs. 16 (Miami Co.Ct. of App.1933), it was held that an action upon a bond against an attaching creditor might be sustained where property was damaged as a proximate result of the attachment, but without any further negligent or wrongful activity by the attaching creditor. Thus, although the goods in *Mickler* were lost by accidental fire, the Court determined that liability for such loss must be borne by the creditor.

▊ Although the question has not expressly been decided, we perceive no reason why the rule should be any different in non-resident defendant actions based upon common law notions of wrongful attachment. In such cases it is the initiation and continued prosecution of the attachment proceedings, maliciously and without probable cause, which is in derogation of the plaintiff's rights and which proximately and foreseeably causes damage to his business and property. In such circumstances, even if the creditor does nothing further, he ought reasonably to bear the burden of foreseeable property damage, just as he would have to if he proceeded upon a statutory bond.

▊ A contrary rule applies to sheriffs who, in the exercise of their statutory duties and subject to penal and civil liability for their nonperformance,[5] physically execute court attachment orders. A sheriff is not an insurer and may be subject to liability in only two

5. See O.R.C. §§ 1917.23, 2707.03.

situations: First, if he fails to exercise reasonable, ordinary care in the preservation of the property once it is in his actual or constructive custody. Fowble v. Rayberg, 4 Ohio 45 (1829); Sammis v. Sly, 54 Ohio St. 511, 521, 44 N.E. 508 (1896); Second, if he mistakenly attaches the property of a stranger to the writ (there is some contrary authority that a sheriff is not under a duty to make a title search when the writ of process presumptively and apparently covers the property attached), see Eversole v. Plank, 17 Ohio 61 (1848); Gibson v. Chillicothe State Bank, 11 Ohio St. 311 (1860); Sifford v. Beaty, 12 Ohio St. 189 (1861); State v. Jennings, 14 Ohio St. 73 (1863); Schaub v. Welfare Finance Corp., 65 Ohio App. 68, 29 N.E.2d 223, 18 O.O. 295 (Shelby Ct. of App.1939); Mueller v. Bates, 13 O.Dec. (Rep.) 195 (1885).

In the present case, we need not determine the sheriff's liability for attaching the plaintiff's independently acquired personal property, for, as we have previously noted, see Finding of Fact 5, *supra*, the plaintiff has not proved his measure of damages with respect to such machinery. We do note, however, our view that a strict application of the above rule would in this instance work a hardship upon the Sheriff, insofar as the writ of process described property (related to the Ideco rig) which was strikingly similar to the plaintiff's own property, was initiated by a creditor who knew at the time of initiation that such equipment was not in Ohio and lacked any covering instruction which might aid the Sheriff in the execution of his duties. Under such circumstances, it was the primary conduct of the bank, and not the Sheriff, which brought about the overreaching attachment.

█ The question remains, however: Did Sheriff Hartenbach exercise reasonable care over the property in his custody? The Sheriff testified that, after receiving reports of vandalism, he or his deputies periodically inspected the machinery, approximately two or three times a week. Under the facts of the case, we believe that his actions were reasonable.

█ The standard of care in such cases must of course be governed by all of the surrounding circumstances: circumstances such as the nature of the property affected, its location and the period of time it is under court process. It cannot be gainsaid that there are different duties and obligations as regards perishable fruit and cement blocks, goods which may be expected to be sold tomorrow and those which will be released next year.

The machinery in the present case was heavy industrial equipment, exceedingly difficult to transport, expensive to warehouse, presumably equal to the elements of sun and snow. It was left on an open lot, but in close proximity to the lot owner's house, and apparently under his purview. The Sheriff could have had no expectation or foreknowledge that the attachment would remain unexecuted and the property languish through the winter and for fourteen months. Had he so known, he might have been under a duty to act differently. However, lacking such foreknowledge, and lacking any instructions from the bank to store and preserve the property, and finally in light of the cumbersome nature of the equipment, we decline to hold the Sheriff to a strict duty of removal and storage. It was not the location that damaged this equipment. By its very nature, such machinery is intended for outdoor use. A lack of maintenance will, however, damage most machinery and that lack was not the fault of the Sheriff.

█ The conduct of the bank cannot be condoned. Especially is this so with regard to its refusal to amend the attachment so as to exclude any reference to the Ideco rig, and its failure to take any action, for over a year, to sell or dispose of the property. Such inaction constitutes a failure to act in a commercially reasonable manner with respect to

the property, see O.R.C. § 1319.18 (U.C.C. 9–207); Michigan National Bank v. Marston, 29 Mich.App. 99, 185 N.W.2d 47 (1970); and exhibits a callous and wanton disregard of the plaintiff's rights, for which the defendant should answer in damages.

### IV

The measure of damages in a wrongful attachment case is the value of the use of the property for the period of the attachment, the amount which will reasonably compensate the plaintiff for damage, proximately caused, to such property, plus the reasonable costs and expenses of procuring a discharge and restoring the property. See, e. g., Newark Coal Co. v. Upson, 40 Ohio St. 17 (1883); Alexander v. Jacoby, 23 Ohio St. 358 (1872); Smith v. Transamerican Freight Lines, *supra*. In addition, where malice and lack of probable cause sufficient to sustain an action for malicious prosecution is proved, exemplary damages may, in the exercise of the Court's discretion, be awarded. Curls v. Lenox Garage Co., 68 Ohio App. 285, 22 O.O. 453, 40 N.E.2d 213 (1938); Munro Hotel Co. v. Brough, 35 O.C.D. 89 (Ohio App.1915); Empire Finance Co. v. Elliot, 6 O.L.A. 497 (Ohio App.1928); John Bright Shoe Stores Co. v. Scully, 24 Ohio App. 15, 156 N.E. 155 (1926); Stephenson v. Duriron Co., 292 F.Supp. 66 (D.C.Ohio 1968), aff'd. 428 F.2d 387 (C.A.6 1970).

In the present case, the plaintiff has not established any loss of business resulting from the seizure of his rig. Nor has he established, beyond conjecture, the reasonable value of that personal property which, taken for the Ideco rig, was mistakenly attached by the Sheriff. There is substantial evidence in the record, however, that during the course of the attachment, plaintiff's tool shed, for example, was broken into and property of some value stolen or vandalized (R. 288, 292). The tool house is the best, although not the only,

example of property which would have remained beyond the reach of the attachment order had it not, pursuant to the actions of the defendant bank, contained an erroneous reference to an identical shed associated with the Ideco rig.[6] Under these circumstances, in the exercise of our discretion, we deem it appropriate to award the plaintiff punitive damages in the amount of $25,000.00.

Compensatory damages for destruction of the plaintiff's rig and equipment is measured by the reasonable market value thereof at the time of its seizure, less that amount realized by the plaintiff at resale. In the instant case, such amount is $44,100.00. See Findings of Fact Nos. 4, 5.

A final word on damages. The defendant bank argues that plaintiff should not recover because he failed to mitigate his damages, either by appearing in the attachment proceeding, pursuant to O.R.C. § 2715.40, or by posting a redelivery bond, as per O.R.C. § 2715.26.

To the extent that this is called a "mitigation of damages" argument, it is, in our view, misstyled. Plaintiff did in fact mitigate his damages by making an immediate and good faith effort to resell the equipment and by realizing six thousand dollars upon such sale.

What defendant seems to be arguing is that plaintiff had a duty to elect, of the various remedies available to him, that which was speediest and most convenient to the defendant. The contention seems to us both disingenuous and ironic, as it ignores the fact that one of the remedies proposed may have been beyond the means of the plaintiff and the fact that, had it not been for the defendant's own failure to prosecute the attachment, plaintiff's damages might have been greatly minimized.

In addition, the defendant's argument is not in accord with Ohio case law. In Sammis v. Sly, 4 O.C.D. 60 (1894),

---

6. See footnote 3, *supra*.

**644**

rev'd. on other grounds, 54 Ohio St. 511, 44 N.E. 508 (1896), the Huron Circuit Court held, in its first syllabus, that:

*When the property of A is levied upon by an officer and held under process against B, A may have an election, either to resort to replevin by* which he may claim the property itself in disregard of the levy, *or he may regard it as depriving him of his property, as the conversion of it by the officer, for which he may have his suit for damages.* (emphasis added)

Additional support for this theory is provided by Fortman v. Rottier, *supra,* 8 Ohio St. at 554, wherein the Supreme Court, in sustaining a common law action for wrongful attachment, held that a plaintiff need not, as a condition precedent to such action, involve himself in the merits of the underlying attachment proceeding.

Judgment is hereby entered to the plaintiff in the total sum of Sixty-nine Thousand, One Hundred Dollars ($69,100.00) in accordance with these findings of fact and opinion of law.

It is so ordered.